**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| KRYSTLE PERRY and ANTHONY PERRY, *individually and on behalf of their minor child K.P.,*<br><br><br>*Plaintiffs,*<br><br>Against<br><br>STACY MARTENEY *in her official capacity as the Virtual Learning Coordinator of the Upshur County Virtual School;* THE BOARD of EDUCATION of the COUNTY of UPSHUR; CHRISTINE MILLER, *in her official capacity as Superintendent of the Upshur County School District*; DR. MATTHEW CHRISTIANSEN, *in his official capacities as the State Health Officer and Commissioner of the Bureau of Public Health*; AND DOUG CIPOLETTI *in his official capacity as Executive Director of the West Virginia Virtual School Academy*;<br><br>*Defendants.* | ELECTRONICALLY FILED<br>7/05/2024<br>U.S. DISTRICT COURT<br>Northern District of WV<br><br><br>Civil Action No.: 2:24-cv-18 Kleeh |

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**SUMMARY**

1.    Plaintiffs Krystle Perry and Anthony Perry individually and on behalf of their minor child, K.P. ("**Plaintiffs**" or "the **Perrys**"), maintain profound religious objections to injecting their eight-year-old child, K.P., with the vaccinations required under W.VA. CODE § 16-3-4 (c) and (e) ("the **Compulsory Vaccination Law**" or the "**CVL**").    West Virginia prohibits K.P. from attending school in West Virginia unless she receives all the vaccines required under the CVL.

1

This prohibition on education, confoundingly, extends to virtual school, an option available in West Virginia.

2.      Until very recently, Plaintiffs were able to ensure K.P. received a quality education, while simultaneously upholding their religious integrity. Plaintiffs did so through enrolling K.P. in the West Virginia Virtual Academy (the "**Virtual Academy**"), a robust online learning program created by statute in W.Va. Code §18-2E-9 in which K.P. was not physically present in a classroom with other children.

3.      This program is a tuition-free online public school available to all West Virginia residents.[1]

4.      When Plaintiffs attempted to re-enroll K.P. in the Virtual Academy during the 2024 school year, including by requesting a religious exemption to the CVL, the request was denied. Virtual Academy officials explained that West Virginia prohibits religious exemptions to the CVL, including for students desiring to further their education remotely.

5.      However, all schools in West Virginia, including the Virtual Academy, permit unvaccinated children to apply for medical exemptions.

6.      Because K.P. is unvaccinated, and lacks secular reasons for being unvaccinated, she was ejected from the Virtual Academy. As a mother who works outside the home, Mrs. Perry is unable to homeschool K.P. Equally problematic, Mr. Perry is 100% disabled and has historically relied heavily on Virtual Academy staff to help facilitate K.P.'s education.  Mr. Perry is now homeschooling K.P., while Mrs. Perry tries her very best to help after she finishes work, causing

---

[1] *See* West Virginia Virtual Academy, *available at* https://wvva.k12.com (last visited July 5, 2024).

an irregular learning schedule for K.P. Consequently, Plaintiffs have been left for the last six months without viable options to ensure K.P. receives the education her peers enjoy.

7.     Plaintiffs face potential criminal prosecution under W.VA. CODE §18-8-2 if they fail to educate K.P.

8.     The straightforward legal issue presented in the Complaint is whether the State of West Virginia violated and continues to violate the Free Exercise clause of the First Amendment through denying K.P. continued enrollment in the Virtual Academy after she sought a religious exemption to the CVL, while permitting children who remain unvaccinated for secular reasons to enroll in the Virtual Academy, and, in addition, in other public and private schools throughout the state and in other settings that undermine any asserted interest in the prevention of communicable diseases.

9.     Recent and directly on point Supreme Court precedent, as applied specifically to Plaintiffs' situation, makes crystal clear that West Virginia's vaccination policy flagrantly violates the United States Constitution. Accordingly, for the reasons more fully detailed below, Plaintiffs request declaratory and injunctive relief.

## **INTRODUCTION**

10.    According to the Pew Research Center, 77% of West Virginians say that "they believe in God with absolute certainty."[2] West Virginia is among the most religious states in America.[3]

---

[2] *See* PEW RESEARCH CENTER, *Religious Landscape Study*, https://www.pewresearch.org/religious-landscape-study/database/west-virginia/ (last visited July 5, 2024).

[3] *See* PEW RESEARCH CENTER, *How religious is you state?* https://www.pewresearch.org/fact-tank/2016/02/29/how-religious-is-your-state/?state=west-virginia (last visited July 5, 2024).

11.     Plaintiffs possess deeply held religious beliefs that forbid them from vaccinating K.P.

12.     Those beliefs have been substantially burdened by West Virginia through the CVL.

13.     Mr. and Mrs. Perry's decision to maintain their and K.P.'s religious convictions have required significant sacrifices. Under threat of criminal penalties, Plaintiffs must ensure K.P. receives an education. However, West Virginia has made it virtually impossible in Plaintiffs' specific case to educate their child, **even remotely from home**, and simultaneously uphold their religious convictions.

14.     West Virginia's compulsory school attendance law requires children between the ages of six and seventeen to be enrolled in an education program. *See* W. VA. CODE § 18-8-1a.

15.     West Virginia's Supreme Court of Appeals has held that "[t]he mandatory requirements of 'a thorough and efficient system of free schools' found in . . . the West Virginia Constitution, make education a fundamental, constitutional right in this State." *Pauley v. Kelly*, 162 W. Va. 672, 707 (W. Va. 1979); *see also State v. Beaver*, No. 22-616, 2022 W. Va. LEXIS 700, at *36 ("Both the State Constitution and [West Virginia courts] have established that education is a fundamental right"); *see also Goss v. Lopez,* 419 U.S. 565, 95 (1975) (when state law creates a right to public education, that right becomes protected by the Due Process Clause of the Fourteenth Amendment).

16.     Despite access to public education in West Virginia being deemed as a fundamental right, Plaintiffs' child has nevertheless been excluded from West Virginia's educational system—including the Virtual Academy—because of her parents' religious beliefs.

17.     K.P.  is unable to access the practical and social benefits of a formal education that her peers enjoy, including peers that remain unvaccinated for secular reasons.

18.     In West Virginia, it is unlawful for any child to attend "any of the schools of the state or a state-regulated childcare center until he or she has been immunized against chickenpox [*i.e.*, varicella], hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and whooping cough" and "[n]o person shall be allowed to enter school without at least one dose of each required vaccine." W. VA. CODE § 16-3-4 (c) and (e).

19.     While it prohibits the option for a religious exemption, West Virginia permits discretionary medical exemptions to the CVL. *See* W. VA. CODE § 16-3-4 (h) (the State Health Officer may grant a medical exemption "upon sufficient medical evidence that immunization is contraindicated or there exists a specific precaution to a particular vaccine.").

20.     This exemption scheme is neither neutral nor generally applicable, and therefore, triggers strict scrutiny. A law triggers strict scrutiny if it is either not generally applicable, or if it lacks neutrality. *Employment Division v. Smith*, 494 U.S. 872 (1990).

21.     The *Smith* framework to addressing free exercise claims grew out of a concern that allowing religious exemptions to certain neutral and generally applicable laws "would be courting anarchy," *Smith*, 494 U.S. at 888, because such laws "could not function" in the face of religious exemptions, *United States v. Lee*, 455 U.S. 252, 260 (1982). In other words, the rationale behind *Smith's* general applicability framework does not hold where a law is readily amenable to a workable religious exemption option, because allowing a religious exemption in such cases does not invoke the concern that every citizen with a purported religious exemption to the law could become a law unto themselves, and permitting exceptions to the law would not "court anarchy." *Smith*, 494 U.S. at 888,

22.     West Virginia's vaccination scheme is amenable to exemptions. The government allows for medical exemptions, and does in fact grant many medical exemptions every year. And religious exemptions can just as easily be allowed as medical exemptions are in West Virginia.

23.     That the state refuses to allow for religious exemptions renders the law as not neutral and not generally applicable.

24.     West Virginia is a radical outlier; forty-five states permit both medical and religious exemptions to childhood vaccination laws. Mississippi's vaccination scheme, which also previously lacked a religious exemption option while providing a medical exemption, was recently struck down under the First Amendment. *See Bosarge v. Edney*, 2023 U.S. Dist. LEXIS 67439, at *27 (S.D. Miss. Apr. 18, 2023) (holding that Mississippi's mandatory vaccination scheme, which lacked a religious exemption option but allowed for a medical exemption option, violated the First Amendment).

25.     The overwhelming majority of states have for many decades offered religious exemptions to their school vaccination requirements without generating the "anarchy" the *Smith* Court was so concerned about. Thus, *Smith's* animating rationale does not apply where the government has shown that the law can be seamlessly administered while also permitting exceptions.

26.     West Virginia is also tremendously relaxed in enforcing the CVL, permitting functional exceptions for children who are willfully non-complaint to continue attending school.

27.     As such, childhood vaccination schemes, including in West Virginia, are clearly amenable to exemptions.  The government's refusal to allow for a religious exemption option renders the CVL not generally applicable and not neutral under *Smith*.  The existence of a religious

exemption in West Virginia would not generate anarchy, because an exemption scheme is already in place.

28.     And the CVL triggers strict scrutiny on additional grounds.

29.     The CVL fails the general applicability test on other grounds because the government permits medical exemptions that are reviewed and accepted or denied on an individualized basis.

30.     Multiple layers of personalized and individualized review of medical exemption requests are performed. At each level, West Virginia officials possess discretion to approve or deny each medical exemption request.

31.     However, Defendants have made a categorical decision that no commensurate process shall be allowed for those desiring to be exempt from the CVL for religious reasons.  Under recent Supreme Court precedent in *Fulton v. City of Philadelphia*, 593 U.S. 522, 537, (2021), the Court held that the "creation of a formal mechanism for granting exceptions renders a policy not generally applicable" where a commensurate mechanism is unavailable to religious adherents. *Id.*

32.     As applied specifically to Plaintiffs' situation, the CVL violates the First Amendment on additional alternative grounds. Independent of *Fulton*, West Virginia's CVL violates the First Amendment because it permits, from a risk perspective, "comparable" secular activity that fatally undermines the State's infectious disease related goals.

33.     A law intended to counteract the spread of infectious diseases is unconstitutional where it permits secular activity while prohibiting similar religious activity. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17-18 (2021) (holding that a New York regulation involving COVID-19 restrictions that prohibited religious gatherings but permitted similar secular gatherings violated the First Amendment); *see also Tandon v. Newsom*, 593 U.S. 61, 62 (2021)

(holding that a California law intended to slow the spread of COVID-19 violated the First Amendment because it treated "comparable secular activity more favorably than religious exercise.").

34.    Whether two activities are comparable for purposes of the free exercise clause depends on "the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62. Whether religious and secular conduct is comparable in the infectious disease context, courts are "concerned with the risks [the] activities pose, not the reasons why" the activities are carried out. *Tandon*, 593 U.S. at 62.

35.    West Virginia maintains that it has a compelling infectious disease mitigation interest in requiring children to comply with the CVL while they are physically present at school. However, as applied to the Virtual Academy, this interest is non-sensical, because there is no physical congregation for a course of instruction that is conducted solely online, where the child is physically located only in his or her home.

36.    Further, West Virginia permits a series of comparable secular activities that endanger the state interests undergirding the CVL.

37.    *First*, West Virginia has granted many medical exemptions to the CVL, and these medical exemptions are for children who attend school in-person. Unvaccinated schoolchildren with a medical exemption are permitted to attend school and intermingle with other children on a daily basis. From a risk perspective, a single child with a medical exemption who attends in-person instruction presents an exponentially greater threat to any purported West Virginia public health interests than permitting K.P. to continue her education in the Virtual Academy with a religious exemption.

38.     *Second*, West Virginia permits scores of unvaccinated children to continue their education, despite non-compliance with the CVL, and these children intermingle in person with their peers on a daily basis. These children have not presented a medical or religious reason for non-compliance with the CVL. From a risk perspective, a single child out of compliance with the law permitted to continue attending school presents an exponentially greater threat to West Virginia's public health goals than permitting K.P. to continue her education in the Virtual Academy with a religious exemption.

39.     *Third*, West Virginia permits adults working in the school system—teachers, administrators, lunch staff, bus drivers, etc.—to altogether disregard the vaccination requirements of the CVL. Most adults working in the system have never been required to receive the full menu of vaccines required under the CVL. From a risk perspective, a single adult working in person in the school system who has not received the vaccines required by the CVL presents an exponentially greater threat to West Virginia's public health goals than permitting K.P. to continue her education in the Virtual Academy with a religious exemption.

40.     *Fourth*, West Virginia does not place restrictions on unvaccinated children or adults outside of the school setting, or outside of school hours. One unvaccinated child or adult attending a University of West Virginia Mountaineers' basketball game—under the government's logic—presents a considerably greater threat to West Virginia's public health goals than permitting K.P. to continue her education in the Virtual Academy with a religious exemption.

41.     *Fifth*, even if the State's infectious disease related goals could logically be restricted to children, and exclusively in a school setting during school hours, West Virginia permits unvaccinated children to be educated in unlimited numbers in "learning pods," a school setting where children intermingle on a daily basis. Under W.V. Code § 18-8-1, the government permits

unvaccinated children—whatever their reasons for declining vaccination—to be educated in these learning pods. This too presents a considerably greater threat to West Virginia's public health goals than permitting K.P. to continue her education in the Virtual Academy with a religious exemption.

42.     Collectively, the aggregation of individual behaviors the government permits— medical exemptions, students who are permitted to attend school on a daily basis while willfully out of compliance with the CVL, teachers and staff who are not subject to the law, the learning pod option for unvaccinated children, and members the general public who have not received vaccines required under the law but who regularly intermingle on school campuses and mass gatherings throughout the state——pose a dramatically greater risk to West Virginia's goals than would permitting K.P. a process to pursue a religious exemption in order to obtain a **virtual** education.

43.     Further, this aggregation of individual behaviors Defendants permit pose a significantly greater risk to Defendants' goals than would permitting a religious exemption option to the CVL to all students who attend virtual online schools without in-person instruction such as the Plaintiff.

44.     Defendants' actions have deprived and will continue to deprive Plaintiffs of their inalienable rights under the United States Constitution.

45.     To be clear, this is an "as applied" challenge. Plaintiffs assert the CVL's specific application to K.P.'s situation violates the First Amendment. Plaintiffs do not assert or seek a ruling on whether the law violates the First Amendment in every conceivable application statewide.

46.     Defendants' actions have deprived and will continue to deprive Plaintiffs of their inalienable rights under the United States Constitution.

47.    Defendants' actions have irreparably harmed and will continue to irreparably harm Plaintiffs.

48.    Defendants committed each act alleged herein under the color and authority of West Virginia law.

## JURISDICTION AND VENUE

49.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.§§ 1331 and 1343(a). This action arises under the First Amendment to the United States Constitution.

50.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because one or more Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this judicial district. More specifically, this action involves K.P.'s disenrollment from West Virginia Virtual Academy, administered through the Upshur County School District. Venue is proper in the District because: (i) Plaintiffs registered and enrolled K.P. in the Virtual Academy through the Upshur County School District; (ii) K.P.'s online learning was administered through the Upshur County School District, from this judicial district and division; (iii) Defendants, by and through their course instruction, communicated such instruction to Plaintiffs and K.P. from this district and division; (iv) Defendants denied Plaintiffs' religious exemption request from this judicial district and division; and (v) the coercion and punishment of Plaintiffs for their religious beliefs were directed from this judicial district and division.

51.    This Court has the authority to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, implemented through Rule 57, Federal Rules of Civil Procedure.

## PARTIES

I.  **PLAINTIFFS ANTHONY AND KRYSTLE PERRY**

### A.  *Plaintiffs Maintain Profound Religious Objections to Vaccination*

52.    Mrs. Perry has been a Christian for most of her adult life. Her Christian beliefs inform every aspect of her life, including how she raises K.P.

53.    The Perrys attend Brooklyn Community Church in Fayetteville, West Virginia.

54.    K.P attends Sunday school with her peers. As a family, the Perrys regularly pray and seek guidance from God. They pray in the mornings, before meals, and regularly read the Bible.

55.    Mrs. Perry has experienced God's healing power in the darkest moments of her life. When she was diagnosed with a blastomycosis, Mrs. Perry feared she would not survive to raise K.P. After much prayer, Mrs. Perry believes God miraculously intervened and healed the condition. She attributes her recovery to the number of people who prayed for her healing and to God's mercy. After this experience, Mrs. Perry's faith grew considerably stronger, and she vowed to put her faith in her God in all aspects of life, especially for health and wellness decisions.

56.    Mrs. Perry presently holds, and for many years has held, sincere religious beliefs in conflict with vaccinating K.P.

57.    When K.P. was born, Mrs. Perry was unaware that many vaccines had illicit connections to abortion.

58.    Mrs. Perry became aware of fetal cell involvement in childhood vaccine development and production in 2018, when K.P. was two years old. Before Mrs. Perry became aware of these connections, K.P. received doses of the vaccines required under the Compulsory Vaccination Law.

59.    Relying on the Bible verse Job 31:15, Plaintiffs believe it is God who forms children in the womb. As a mother and devout Christian, Mrs. Perry strongly opposes what she deems as the sin of abortion. She views the taking of an unborn life through abortion as murder. She considers injecting a vaccine that relies on abortion to exist to be a sin – a sin that, in her system of religious beliefs would have eternal consequences for herself, her family, and K.P.

60.    Mr. Perry shares these beliefs.

61.    Religious objections to vaccination based on fetal cell involvement in the development and production of vaccines on the childhood schedule is not an attenuated or foundationless religious objection. Abortion and fetal cell research in the development of childhood vaccines is well-documented. For example, in just one study over 75 normally developing babies were aborted, and while keeping the fetuses alive for harvesting their body parts, had nearly every body part chopped up into little cubes to culture viruses on, including chopping up their tongues, livers, intestines, pituitary glands, kidneys, and hearts. *See* **Exhibit 1**, The Wistar Institute of Anatomy and Biology, *Cytological Virological and Chromosomal Studies of Cell Strains from Aborted Human Fetuses* (May 1966) (detailing aborted pre-born and normally developing children in support of vaccination research and development).

62.    In sworn testimony, Dr. Stanley Plotkin—who is commonly referred to as the "Godfather" of childhood vaccines, and one of lead researchers on the aforementioned study—candidly admitted he worked with the chopped up pituitary glands, kidneys, spleens, and hearts of seventy-six healthy, normally developing babies, whose mutilated bodies were utilized in furtherance of his vaccine research. *See* **Exhibit 2**, excerpts of Deposition of Stanley Plotkin, Jan. 11, 2018, at pdf pp. 9-12 of 17. *See also* excerpt of deposition video of Dr. Stanley Plotkin discussing this study, *available at* https://www.sirillp.com/plotkin-abortion/ (last visited July 5, 2024).

63.     Additionally, many of the required vaccines contain genetic material derived from aborted fetuses, materials that would be injected directly into K.P.'s body were Plaintiffs to comply with West Virginia's mandatory vaccination requirements. *See, e.g.,* Food and Drug Administration ("**FDA**") Package Insert for M-M-R II Vaccine, attached hereto as **Exhibit 3**, at pdf p. 8 of 12 (stating the Measles, Mumps, and Rubella ("**MMR**") combination vaccine contains strains of "human diploid lung fibroblasts" cultured from a fetal cell line); *see also* FDA Package Insert for VARIVAX vaccine, attached hereto as **Exhibit 4**, at pdf pp. 9-10 of 16 (stating the Varicella vaccine was propagated in "human diploid cell cultures" and "contains residual components of [a fetal cell line] including DNA and protein").

64.     For Plaintiffs, to vaccinate K.P. would be to force them into participating in an action with illicit connections to the termination of an innocent life, and into activity that condones abortion. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (the First Amendment protects the right to abstain from "performing physical acts) (citation omitted); *see also Wisconsin v. Yoder*, 406 U.S. 205, 209 (1972) (the First Amendment protects one's right to abstain from activities that would "endanger [a parent's] own salvation and that of their children").

65.     After learning that many vaccines have been researched, tested, and developed through the use of aborted fetal cell lines, and that several vaccines required under the CVL contain human genetic material derived from aborted pre-born children, the Perrys ceased vaccinating when K.P. was two years old. Plaintiffs cannot in good conscience knowingly inject K.P. with anything that would make them complicit in the sin of abortion. Plaintiffs believe abortion constitutes a taking of an innocent human life, relying on Proverbs 6:16-17 (instructing that God hates those who "shed innocent blood".)  Accordingly, Plaintiffs believe that supporting abortion would potentially endanger their and K.P.'s souls.

14

66.    After thoughtful prayer and reflection, Plaintiffs also developed religious objections to vaccination based on the belief that they must not alter K.P.'s God-given natural immune system. Plaintiffs believe that human beings were created in God's image, according to God's perfect plan (even though physical imperfections exist). Based on the Bible passage Mark 2:17, which counsels that healing is to be directed towards those who are actually sick, Plaintiffs do not seek medical attention unless they or K.P. are sick, and additionally, only in cases where, after thought and prayer, they are certain their God-given immune systems are incapable of eliminating that sickness. To do otherwise would be to preemptively alter the immune system God designed and would demonstrate a lack of faith in God.

67.    While Plaintiffs are not opposed to all medication, they do not seek out medical intervention where no serious illness exists.  As such, for religious reasons, Plaintiffs do not initiate medical procedures preemptively, like vaccination, for K.P. In Plaintiffs' system of religious beliefs, preemptively altering God's perfect and unique design for K.P.'s immune system would violate God's plan for K.P.'s life.

### B. Plaintiffs' Religious Beliefs and Practices are Substantially Burdened by the CVL

68.    Plaintiffs have been negatively impacted on multiple fronts by the decision to exercise their sincerely held religious beliefs in conflict with vaccination. K.P. has been categorically excluded from West Virginia's educational system, including the irrational and punitive exclusion of K.P. from pursuing her education at home, online, through the Virtual Academy.

69.    In or around May 2022, and as permitted by state law, Mrs. Perry enrolled K.P. in the Virtual Academy through the Upshur County School District. She did this because her cousin informed Mrs. Perry that the Upshur County School District did an exceptional job of keeping parents informed regarding Virtual Academy requirements and did an excellent job at facilitating

15

enrollment and administration of Virtual Academy requirements. The Virtual Academy enrollment process is very easy to navigate and is efficient.  In 2022, Plaintiffs were able to get K.P. enrolled in less than a week.

70.     From August of 2022 through January of 2024, K.P. excelled in learning in the Virtual Learning Academy.

71.     K.P. received high grades in English, Math, Science, History and Art. In the Virtual Academy, K.P. was enthusiastic about learning, and thrived in the structure and social interactions the Academy provided.

72.     K.P. enjoyed interacting with her peers virtually through the Virtual Academy. Daily interactions with her peers were an integral aspect of K.P.'s educational and social development.

73.     Mrs. Perry's husband is 100% disabled and receives Supplemental Security Income ("**SSI**") through the Social Security Administration. Mr. Perry was born prematurely and has experienced profound health complications throughout his life. He is 100% blind in one eye and has been diagnosed with a learning disability.

74.     While Mrs. Perry worked, Mr. Perry was able to seamlessly oversee K.P.'s education with the significant resources provided by Virtual Academy administrators.

75.     After K.P. had been enrolled and learning in the Virtual Academy for approximately 16 months, Mrs. Perry was contacted by Virtual Learning Coordinator for the Upshur County Schools, Stacy Marteney, sometime in December 2023. Ms. Marteney inquired regarding K.P.'s vaccination status, informing Mrs. Perry that K.P. had to receive the vaccines required under the CVL if she desired to continue her education in the Virtual Academy.

76.    On or around December 27, 2023, Ms. Marteney followed up and asked Mrs. Perry if K.P. was up to date on her vaccines. Mrs. Perry replied that she cannot vaccinate K.P.

77.    On January 3, 2024, Mrs. Perry was again contacted by Ms. Marteney regarding K.P.'s vaccination status, and when Mrs. Perry again confirmed that she could not vaccinate K.P. Ms. Marteney notified Mrs. Perry that K.P. would promptly be dis-enrolled from the Virtual Academy.

78.    K.P. was permitted to finish out the week, and then her online virtual learning credentials were cancelled on or around January 5, 2024, leaving her with no access to her teachers, classmates, or curricula materials.

79.    On April 1, 2024, Mrs. Perry inquired whether she could submit a religious exemption to the CVL to continue K.P.'s education through the Virtual Academy. On April 3, 2024, Ms. Marteney replied that "unfortunately there is still not a religious exemption available." *See* **Exhibit 7**, Denial of Religious Exemption.

80.    K.P. must now be homeschooled, with little to no interaction with children of her age for her education.

81.    This change has caused a significant decrease in K.P.'s enthusiasm for learning. K.P was thriving at the Virtual Academy, but her appetite for learning diminished once she was transitioned to full-time homeschool.

82.    K.P no longer has any routine or structure in her day. While attending the Virtual Academy, K.P. would meet with her homeroom on Mondays and Fridays at 9:00 AM. After homeroom, K.P. would attend optional elective courses.

83.    K.P.'s lessons targeted core subjects each day.

84.    On occasions where K.P. was unable to immediately grasp concepts, K.P. and Mr. Perry had access to a full range of support through the Virtual Academy to help K.P. grapple through and conquer the learning issues she confronted.

85.    K.P. earned straight A's while in the Virtual Academy.

86.    With the support system the Virtual Academy provided, Mr. Perry was able, despite his disabilities, to seamlessly guide K.P. through the virtual educational program. Without the support system the Virtual Academy provides, Mr. Perry has struggled to advance K.P.'s education at the same level K.P. was learning through the Virtual Academy.

87.    If West Virginia continues to prohibit religious exemptions to the Virtual Academy, the only remaining option for the Perrys to ensure K.P. receives an education is to homeschool. Because of the Perrys' unique situation, homeschooling is a less-than-optimal situation for K.P.'s learning needs.

88.    K.P. is unable to access the practical and social benefits of a typical education that her secular peers enjoy. In short, without a religious exemption, the Perrys have been deprived of the West Virginia's guarantee of a public education, unless they violate their sincerely held religious beliefs.

89.    West Virginia's refusal to allow K.P. to continue her education through the Virtual Academy is having and will have lifelong and negative impacts on K.P.

### C. Despite Being Categorically Excluded from Receiving an Education in West Virginia, K.P. Regularly Interacts with her Peers

90.    Notwithstanding the CVL, K.P regularly socializes with other children her age. K.P. interacts regularly with her West Virginia peers outside of school on a weekly basis (*e.g.,* at group church gatherings and at various other community activities).

91.     K.P frequently visits with her cousins, friends, and plays with and learns alongside children at Sunday school.

## II.   DEFENDANTS

92.     Defendant, Stacy Marteney ("**Ms. Marteney**") is the Virtual Learning Coordinator for the Upshur School District, the District through which Plaintiffs enrolled, and attempted to re-enroll, K.P. into the Virtual Academy.  Ms. Marteney is sued solely in her official capacity. Ms. Marteney is tasked with implementing and enforcing, and does implement and enforce, the mandatory vaccination requirements of the CVL against school-aged children desiring to attend the Virtual Academy, and she enforced the CVL against the Plaintiffs and excluded K.P. from the Virtual Academy.  She is located at 102 Smithfield St. Buckhannon, West Virginia, 26201.

93.     The Board of Education of the County of Upshur ("**Board**") is the duly empaneled school board for Upshur County, which pursuant to W. VA. CODE §§ 18-5-1, 18-5-5, 18-5-34, has authority and control over the school district, and, pursuant to state law, was responsible for enforcing the CVL against Plaintiffs, resulting in the exclusion of K.P. from school. The Board is located at 102 Smithfield St. Buckhannon, West Virginia, 26201.

94.     Christine Miller ("**Ms. Miller**") is the duly empaneled Superintendent of the Upshur County School District, being sued only in her official capacity as Superintendent, with the duties as outlined in W. VA. CODE § 18-4-10 to include enforcement of all policies and procedures by state law, including, as is relevant here, enforcement of the CVL against Plaintiffs and K.P. Ms. Miller is located at 102 Smithfield St. Buckhannon, West Virginia, 26201, and is sued solely in her official capacity.

95.     Defendant Dr. Mathew Christiansen ("**Dr. Christiansen**") is made party to this action in his official capacity as State Health Officer and Commissioner for the West Virginia Department of Health and Human Resources. Under West Virginia law, and specifically the CVL,

at W. VA. CODE § 16-3-4 (c), (d), (e), and (h), Dr. Christiansen is specifically tasked with implementing and enforcing, and does implement and enforce, the mandatory vaccination requirements of the CVL for school-aged children, including children wishing to enroll in the Virtual Academy, while simultaneously granting medical exemptions under the CVL to unvaccinated West Virginia schoolchildren.  He is sued solely in his official capacity.

96.    Defendant, Doug Cipoletti ("**Mr. Cipoletti**") is the Executive Director of the Virtual Academy.[4]  Mr. Cipoletti is tasked with implementing and enforcing, and does implement and enforce, the mandatory vaccination requirements of the CVL against school-aged children desiring to attend the Virtual Academy, including K.P.  The West Virginia Virtual Academy is a tuition free online Public School offered to children grades K-12. While the Virtual Academy has a psychical location at 3508 Staunton Ave., 3rd Floor, Charleston, West Virginia, 25304, the Virtual Academy enforces the CVL against schoolchildren throughout the state, including in this judicial division and district, and was involved in enforcing the CVL generally resulting in the exclusion of K.P.  He is sued solely in his official capacity.

## STATEMENT OF FACTS

**I.    DEFENDANTS' CATEGORICAL "NO RELIGIOUS EXEMPTION POLICY" AND NON-ENFORCEMENT OF THE CVL.**

### A.    CVL Requirements and Limitations of the Mandated Vaccines

97.    Under the CVL, every "child entering school or a state-regulated childcare center in this state must" receive certain vaccines. W. VA. CODE § 16-3-4 (b).

98.    In West Virginia, it is unlawful for any child to attend "any of the schools of the state or a state-regulated childcare center until he or she has been immunized against chickenpox

---

[4] *See* WEST VIRGINIA VIRTUAL ACADEMY, *available at* https://wvva.k12.com/about-our-school/letter-from-our-head-of-school/ (last visited July 5, 2024).

[*i.e.*, varicella], hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and whooping cough [i.e., pertussis]" and "[n]o person shall be allowed to enter school without at least one dose of each required vaccine." W. Va. Code § 16-3-4 (c) and (e).

99.    No child may be "admitted or received in any of the schools of the state" unless they have received these vaccines. *Id.* at § 16-3-4 (c). And § 16-3-4 (d) requires school and childcare personnel to report to the commissioner (who is also the State Health Officer) any attempts to enroll unvaccinated children in schools.

100.    Many of these vaccines have been combined into single dose shots (e.g., the measles, mumps, and rubella ("**MMR**"), whereby multiple vaccinations are combined into one injection, and multiple vaccination are administered in a single dose.

101.    Most of the injections required under the CVL provide at best personal protection.

102.    For example, the tetanus, diphtheria, and pertussis vaccine ("**DTaP**" and/or "**Tdap**") does not prevent infection or transmission of the diseases it targets. This vaccine potentially provides only a level of personal protection by preventing a recipient from experiencing the symptoms of these infections.

103.    Tetanus is not even an infectious disease. As such, the tetanus vaccine does not prevent infection and transmission of a communicable disease, but rather can only provide personal protection for the recipient. *See* CDC Pink Book*, available at* https://www.cdc.gov/vaccines/pubs/pinkbook/tetanus.html#:~:text=Tetanus%20is%20not%20contagious%20from,is%20infectious%20but%20not%20contagious (stating "Tetanus is not contagious from person to person.") (Last visited July 5, 2024).

104.    Likewise, the pertussis vaccine provides only personal protection. *See e.g.,* https://pubmed.ncbi.nlm.nih.gov/31333640/ (stating "Natural infection evokes both mucosal and

systemic immune responses, while aPVs [acellular pertussis vaccine, the exclusive pertussis vaccine used in the United States] induce only a systemic immune response. … Mucosal immunity is essential to prevent colonization and transmission of B. pertussis organisms. Consequently, preventive measures such as aPVs that do not induce a valid mucosal response **can prevent disease but cannot avoid infection and transmission. … aPV pertussis vaccines do not prevent colonization. As such, they do not reduce the circulation of B. pertussis and do not exert any herd immunity effect**.") (Emphasis added) (last visited July 5, 2024).

105.    The same is true of the diphtheria vaccine—it is at best a personal protection device. *See e.g.,* https://pubmed.ncbi.nlm.nih.gov/5026197/ (Diphtheria vaccine only creates antibodies to a toxin released by the diphtheria bacteria and does not generate any antibodies to the diphtheria bacteria itself, hence "**Diphtheria toxoid helps prevent symptomatic disease but does not prevent the carrier state nor stop the spread of infection**.") (Emphasis added) (last visited July 5, 2024).

106.    The meningococcal vaccine also does not contribute to herd immunity but at best provides an undefined personal benefit to the vaccine recipient. "Rates of meningococcal disease have declined in the United States since the 1990s and remain low today. Much of the decline occurred before the routine use of MenACWY vaccines. … [D]ata suggest MenACWY vaccines have **provided protection to those vaccinated, but probably not to the larger, unvaccinated community (population or herd immunity**)." *See* CDC, *Meningococcal Vaccination: What Everyone Should Know*, *available at* https://www.cdc.gov/vaccines/vpd/mening/public/index.html (emphasis added) (last visited July 5, 2024).

107.    Contrary to the common conceptions, the currently mandated polio vaccine (and the only one available in the United States) also does not prevent infection and transmission of the targeted pathogen. It too is a personal protection device. That is because the "inactivated polio vaccine (IPV) is the only polio vaccine that has been given in the United States since 2000."[5] "IPV… protects people from polio **disease but does not stop transmission of the virus**." *See* CDC webpage, *Polio Disease and Poliovirus Containment, available at* https://www.cdc.gov/orr/polioviruscontainment/diseaseandvirus.htm, which links to the *CDC et al., Polio Global Eradication Initiative* webpage, *available at* https://polioeradication.org/polio-today/polio-prevention/the-vaccines/ipv/ which further explains: "IPV induces very low levels of immunity in the intestine. As a result, when a person immunized with IPV is infected with wild poliovirus, the virus can still multiply inside the intestines and be shed in the feces **… IPV does not stop transmission of the virus**." (Emphases added) (last visited July 5, 2024).

108.    Like COVID-19 vaccines, these vaccines are not designed to create, nor do they result in "herd immunity."

109.    Since these products reduce symptoms, but do not prevent infection and transmission, those vaccinated with these products are more likely to asymptomatically spread the pathogen due to a false sense of security and misunderstanding of the limitations of the injections.

110.    Further, hepatitis B is not transmitted in a school setting, as confirmed by federal health authorities. In response to a FOIA request, the CDC stated, "A search of our [CDC] records failed to reveal any documents" of "transmission of Hepatitis B in an elementary, middle or high school setting." *See* **Exhibit 5**, CDC FOIA Response Regarding Hep B Vaccine. This makes sense

---

[5] *See* CDC webpage, *Polio Vaccination*, *available at* https://www.cdc.gov/vaccines/vpd/polio/index.html (Last visited July 5, 2024).

since hepatitis B is not transmitted through activities that occur in a school setting.  It is also worth noting that "almost all children 6 years and older and adults infected with the hepatitis B virus recover completely and do not develop chronic infection." *See* CDC, *Hepatitis B, available at* https://www.cdc.gov/hepatitis/hbv/index.htm. (Last visited July 5, 2024).

111.    Thus, four of the six injections[6] required under the CVL are incapable of preventing infection and transmission of target pathogens in the school setting and are, at best, personal protection devices.

112.    The only remaining vaccines required under the CVL are the MMR and varicella injections. K.P. has received the first dose of both these vaccines, before they Perrys learned of these injections illicit connections to abortion.

113.    The difference of protection stated by the CDC is negligible between one and two doses of the MMR vaccine. The CDC states that a single dose of the MMR K.P. received is 93% effective against the disease, as compared to 97% for two doses.[7]

114.    Further, for the varicella vaccine (i.e., the chickenpox), CDC states that a single dose of the varicella K.P. received is 100% effective against "severe varicella," and 82% effective at "preventing any form of varicella," while two doses are likewise 100% effective against "severe varicella," and 92% effective at "preventing all varicella."[8]  The gains from additional injections are, therefore, marginal at best.

---

[6] Ten vaccines are required under the CVL, *see* W. VA. CODE § 16-3-4 (c) and (e), but because they are injected in combination vaccines, a total of six distinct products with multiple doses for several of the vaccines (e.g., MMR, DTaP, varicella, etc.) are required.

[7] *See CDC, About Measles, available at* https://www.cdc.gov/measles/vaccination.html (Last visited July 5, 2024).

[8] *See CDC, About the Varicella Vaccines, available at* https://www.cdc.gov/vaccines/vpd/varicella/hcp/about-vaccine.html (Last visited July 5, 2024).

115.    In addition, the varicella vaccine is a live virus vaccine, meaning there is, albeit modified, live chicken pox virus in each dose. Those vaccinated with this live virus can infect others with the chicken pox virus for up to six weeks after receipt of the live vaccine. This is why its package insert, approved by FDA, explains "that transmission of varicella vaccine virus (Oka/Merck) resulting in varicella infection including disseminated disease may occur between vaccine recipients (who develop or do not develop a varicella-like rash) and contacts susceptible to varicella including healthy as well as high-risk individuals" and that "[d]ue to concern for transmission of vaccine virus, vaccine recipients should attempt to avoid whenever possible close association with susceptible high-risk individuals for up to six weeks following vaccination" including "[i]mmunocomposed individuals [and] [p]reganant women … [and] [n]ewborn infants of mothers without documented history of varicella." *See* https://www.fda.gov/media/76008/download?attachment. (Last visited July 5, 2024). Nonetheless, Defendants do not exclude those vaccinated with this product from schools for six weeks after vaccination to prevent transmission.

### B.  The Government Grants Medical Exemptions and Practical Exceptions Through Non-Enforcement of the CVL

116.    While West Virginia requires that unvaccinated children enrolled in school be reported to the Department of Health pursuant to W. VA. CODE § 16-3-4 (d), Defendants liberally allow unvaccinated children to remain in school.

117.    West Virginia allows unvaccinated children to remain enrolled in school and to attend in-person classes, provided they do not, like Plaintiffs, request a religious exemption before enrolling or re-enrolling. For example, in response to requests under the West Virginia Freedom of Information Act, W. VA. CODE § 29B-1-1, et seq., ("**WVFOIA**"), the Fayette County Board of Education responded that currently, in the 2023/2024 school year, 440 unvaccinated children were

enrolled in in-person classes for more than thirty days.[9] The Monongalia County School District reported 147 children out of compliance with the Compulsory Vaccination Law were enrolled in in-person classes for more than thirty days,[10] and the Upshur County School District—the district K.P. enrolled in the Virtual Academy, and the district in which her virtual education was administered—reported that 46 unvaccinated children who are out of compliance with the CVL were enrolled in in-person classes for more than thirty days.[11]

118.    These are just three examples of school districts who permit unvaccinated students to attend in-person classes. On information and belief, many more unvaccinated students are permitted to attend in-person classes while out of compliance with the CVL in school districts throughout the state.

119.    Official government records also indicate considerable non-compliance rates for West Virginia kindergarteners attending in-person classes. For example, according to CDC records for the 2022-2023 school year, as many 4.4% of West Virginia kindergarteners are out of compliance with the CVL. *See* Centers for Disease Control, *Vaccination Coverage and Selected Vaccines and Exemption Rates Among Children in Kindergarten – United States, 2022-23 School Year*, available at [https://www.cdc.gov/mmwr/volumes/72/wr/mm7245a2.htm#:~:text=National%20coverage%20remained%20near%2093,22%20school%20year%20(2.6%25)](https://www.cdc.gov/mmwr/volumes/72/wr/mm7245a2.htm#:~:text=National%20coverage%20remained%20near%2093,22%20school%20year%20(2.6%25)) (detailing percentages of religious and medical exemption rates, along with non-compliance rates, for U.S. kindergarteners in the 2022-23 school year, and detailing a non-compliance rate in West Virginia of approximately 4.4%) (last visited July 5, 2024)).

---

[9] *See* **Exhibit 8**, Fayette County WVFOIA response.

[10] *See* **Exhibit 9**, Monongalia County WVFOIA response.

[11] *See* **Exhibit 10** Upshur County WVFOIA response.

120.    These involve instances of school districts and children that are willfully out of compliance with the CVL, yet the students are permitted to continue their educations in-person, while K.P. was ejected from the Virtual Academy after seeking a religious exemption.

121.    West Virginia's lackadaisical approach to its vaccination requirements in school settings is further demonstrated by the fact that teachers and others working in West Virginia's educational system are not subject to the vaccination requirements of the CVL. Many, if not most, teachers, administrators, and staff working in the West Virginia school system have never been required to receive the full battery of injections required by the CVL.

122.    This is because, as of 1986, when many of the adults in the school system were themselves in school, there were only three routine vaccines in the U.S. It was only after 1986, the year Congress gave pharmaceutical companies immunity for liability for injuries caused by childhood vaccines, that the explosion in the childhood vaccine schedule occurred. *See* 42 U.S.C. §§ 300aa-11. And on the tails of this liability protection, West Virginia first required the recombinant Hep-b vaccine (first licensed in 1986) for school; the varicella vaccine (first licensed in 1995); the pertussis vaccine (licensed in 2005); and conjugate meningococcal vaccine (first licensed in 2005).

123.    This means that most adults in the State, who comprise over 80% of the state's population,[12] were never subject to most of the State's school vaccine requirements.

124.    West Virginia also permits medical exemptions to its childhood vaccination requirements. While religious exemptions are prohibited, a child may be exempt from the

---

[12]    *See* UNITED STATES CENSUS BUREAU, QuickFacts, West Virginia, *available at* https://www.census.gov/quickfacts/fact/table/WV,US/PST045223 (last visited July 5, 2024)

requirements upon producing a certificate "granting the child . . . a[] [medical] exemption from the compulsory immunization requirements." W. Va. Code § 16-3-4 (h).

125.    For example, in response to WVFOIA requests, the Harrison County School District reported that it had recently granted nine medical exemptions to the CVL,[13] the Monongalia County School District reported seven medical exemptions,[14] and the Upshur County School District reported two medical exemptions.[15]

126.    These are just three examples of school districts who grant medical exemptions to in-person students. On information and belief, many more unvaccinated students are permitted to attend in-person classes with medical exemptions, and the Virtual Academy also allows for medical exemptions.

### C.  K.P. was Thriving at the West Virginia Virtual Academy, Where She Posed a Non-Existent Threat to Defendants' Infectious Disease Related Goals

127.    West Virginia's justification for the CVL is to mitigate against infectious disease, specifically amongst children in school settings.

128.    Because infectious diseases do not only spread in school settings, and impact adults and schoolchildren alike, the CVL can never credibly fulfill West Virginia's contagious disease mitigation goals.

129.    Even if the State's interest in vaccinating its citizens could somehow logically be limited exclusively to children in a formal school setting, allowing K.P. to access a religious exemption to the Virtual Academy—**where she does not interact in person with classmates**—

---

[13] *See* **Exhibit 11**, Harrison County WVFOIA response.

[14] *See* **Exhibit 9**, Monongalia County WVFOIA response.

[15] *See* **Exhibit 10**, Upshur County WVFOIA response.

does not remotely threaten Defendants' goals, and certainly not to the degree that medical exemptions do.

130.    The Virtual Academy is a tuition-free online public school offering virtual education to children from kindergarten through grade twelve.[16] The program is available for all West Virginia residents.[17]

131.    The Virtual Academy is administered through local school districts. Parents must enroll in virtual school through a county school district.

132.    Once enrolled, administrators from the sponsoring school district provide the family with credentials to access the program. Plaintiffs were provided enrollment credentials through representatives from the Upshur County School District.

133.    The Virtual Academy offers a flexible learning curriculum with core subjects in English, Science, Math, History and Art. The program allows for a customized educational experience for each child.

134.    For approximately 17 months, from August of 2022 to January of 2024, K.P. was enrolled in and thrived at the Virtual Academy without her vaccination status being an issue and without endangering the government's public health goals.

135.    The situation was ideal for Plaintiffs as Mrs. Perry is a working mother and is unable to personally homeschool K.P. full time, which, prior to the availability of the Virtual Academy, was the only educational option in West Virginia for children who remained unvaccinated for religious reasons.

---

[16] *See* WEST VIRGINIA VIRTUAL ACADEMY, *available at* https://wvva.k12.com/ (last visited July 5, 2024).
[17] *Id.*

136.    Mr. Perry, who is 100% disabled, shepherded K.P. through Virtual Academy from home, with considerable assistance for Virtual Academy staff.

137.    All learning materials, books, and lesson plans are provided to the family free of charge, or at very low cost. This virtual learning program allows for flexible learning hours to fit the child's needs and schedule.

138.    Even though Virtual Academy students learn from home and are not required to interact in person with their virtual classmates, Virtual Academy students are subject to the CVL's requirements.

139.    Plaintiffs have requested that they be permitted to seek a religious exemption to the CVL so their child can continue her education.  Their request for a religious exemption and accommodation were rejected.

140.    However, the CVL and Defendants have made clear that medical exemptions are available for schoolchildren with secular reasons for declining vaccination, including those enrolled for in person learning as well as for Virtual Academy students.

### D. West Virginia's Categorical Intolerance for Non-Vaccination for Religious Reasons, Even in Virtual Settings

141.    West Virginia simply cannot tolerate non-vaccination for religious reasons.  The State is perfectly fine if children remain unvaccinated for medical reasons and attend in person school, or even if they are willfully non-compliant with the law (for any reason they choose) and attend school, provided they do not, like Plaintiffs, request a religious exemption to continue in school.

142.    However, from a disease prevention and risk perspective, there is no reason "why religion alone must bear the burden" of the State's push to mitigate against infectious disease. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 544 (1993).

143.    As conclusive evidence of West Virginia's intolerance for non-vaccination for religious reasons, West Virginia Governor Jim Justice recently vetoed a bill that would have allowed for religious exemptions in virtual public schools, like the Virtual Academy.[18]

144.    The medical exemption option, however, remains intact and children unvaccinated for secular reasons are permitted to intermingle daily with their classmates at school.

145.    Further, while the State made the conscious choice to prohibit religious exemptions even in virtual settings, West Virginia continues in its relaxed enforcement of the CVL, allowing many hundreds of unvaccinated schoolchildren who are willfully noncompliant with the law to continue to attend classes in-person.

146.    Because of Governor Justice's veto, Plaintiffs specifically chose not to challenge the CVL under the recently enacted West Virginia Equal Protection for Religion Act, West Virginia Code § 35-1A-1 (2023) (the "**EPRA**"), which arguably contains protections that may overlap with the concrete protections the First Amendment affords.

147.    This is because, whatever protection EPRA may hypothetically provide, that theoretical shield for religious freedom in West Virginia is transient and passing, contingent on the shifting opinions of elected officials (like Governor Justice and a future legislature).

148.    Elected officials can just as easily rescind EPRA, and whatever religious freedoms it may protect.  And given Governor Justice's veto, it is clear that EPRA would not have been enacted if it included an option for a religious exemption to childhood vaccination.

149.    Thus, Plaintiffs seek the bedrock, unchanging protections only accessible under the First Amendment. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) (observing

---

[18] *See* WV HB5105, *A Bill to Eliminate Vaccine Requirements for Public Virtual Schools*, https://www.billtrack50.com/billdetail/1687129 (last visited July 5, 2024).

that one's "right to . . . freedom of worship . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.").

### E.    Recent First Amendment Free Exercise Developments

150.    Directly applicable constitutional jurisprudence has fundamentally evolved to require strict scrutiny review for situations virtually identical to the issues presented here.

151.    Religious exemptions have long been the norm when it comes to school vaccination laws. Forty-five states (plus the District of Columbia) currently offer religious exemptions to their school vaccination laws.[19]

152.    West Virginia is a radical outlier in prohibiting a religious exemption option. Only five states do not currently allow for religious exemptions, and for most of them, this is a relatively recent development.  California, Maine, Connecticut, and New York historically allowed religious exemptions, but those options were recently removed by the legislatures of those states.[20]

---

[19] *See* Ala. Code § 16-30-3; Alaska Admin. Code tit. 7, § 57.550; Ariz. Rev. Stat. Ann. §§ 15-872(G), -873(A)(1); Ark. Code Ann. § 6-18-702(d)(4)(A); Colo. Rev. Stat. §§ 25-4-902, -903(b)(V); Del. Code Ann. tit. 14, § 131(a)(6); D.C. Code §§ 38-501, -506(1); Fla. Stat. § 1003.22(1); Ga. Code Ann. § 20-2-771(e); Haw. Rev. Stat. §§ 302A-1154, -1156(2); Idaho Code §§ 39-4801, -4802(2); 105 Ill. Comp. Stat. § 5/27-8.1(6); Ind. Code § 21-40-6; Iowa Code § 139A.8(4)(a)(2); Kan. Stat. Ann. § 72-6262(b)((2); Ky. Rev. Stat. Ann. § 214.034(2); La. Stat. Ann. §§ 17:170(E), 40:31.16(D); Md. Code Ann., Educ. § 7-403(b)(1); Mass. Gen Laws ch. 76, § 15; Mich. Comp. Laws §§ 333.9208, .9215(2); Minn. Stat. § 121A-15; Mo. Rev. Stat. §§ 167.181(3), 210.003; Mont. Code Ann. §§ 20-5-403, -405(1)(a); Neb. Rev. Stat. §§ 79-217, 221(1); Nev. Rev. Stat. §§ 392.435, .437; N.H. Rev. Stat. Ann. § 141-C:20-a, :20-c; N.J. Stat. Ann. § 26:1A-9.1; N.M. Stat. Ann. § 24-5-1, -3(A); N.C. Gen. Stat. §§ 130A-155, -157; N.D. Cent. Code § 23-07-17.1(3); Ohio Rev. Code Ann. § 3313.671(B)(4); Okla. Stat. tit. 70, §§ 1210.191, .192; Or. Rev. Stat. § 433.267(1)(c)(A); 28 Pa. Cons. Stat. §§ 23-83, -84; 16 R.I. Gen. Laws § 16-38-2(a); S.C. Code Ann. § 44-29-180(D); S.D. Codified Laws § 13-28-7.1; Tenn. Code Ann. § 49-6-5001(b)(2); Tex. Educ. Code Ann. § 38.001(c)(1)(B); Utah Code Ann. § 53G-9-303(3); Vt. Stat. Ann. tit. 18, §§ 1121, 1122(3)(A); Va. Code Ann. §§ 22.1-271.2(C), 32.1-46(D)(1); Wash. Rev. Code § 28A.210.080, .090(1)(c); Wis. Stat. § 252.04(3); Wyo. Stat. Ann. § 21-4-309(a). Mississippi now offers a religious exemption after a federal court issued a permanent injunction following a free exercise challenge requiring Mississippi to provide a religious exemption process. *See Bosarge v. Edney*, 669 F. Supp. 3d 598, 625 (S.D. Miss. 2023).

[20]    *See, e.g.,* Cal. Health & Safety Code § 120325 *et seq.* (religious exemption eliminated in 2016); N.Y. Pub. Health Law § 2164(1) (religious exemption removed in 2019); Conn. Gen. Stat. § 10-204a (religious exemption eliminated in 2021); Me. Stat. tit. 20-A, § 6355 (religious exemption eliminated in 2019). West Virginia is the only state that has never offered a religious exemption. W. Va. Code § 16-3-4.

153.    More importantly, First Amendment jurisprudence has fundamentally evolved in recent years. There have been five Supreme Court cases that are particularly relevant to the First Amendment issues at hand, and those cases each in isolation dictate strict scrutiny review here.

154.    Before *Emp't Div. v. Smith,* 494 U.S. 872 (1990), courts struggled with what level of judicial scrutiny to apply to free exercise claims. Because of the country's diversity of religious beliefs, almost every government regulation burdened, to some degree or another, a religious belief system. The *Smith* Court confronted this issue and held that laws that only "incidentally" burden religion expression ordinarily are not subject to strict scrutiny under the Free Exercise Clause, reasoning to do otherwise would be "courting anarchy." *Id.* at 888.

155.    However, the *Smith* Court held that strict scrutiny would apply to regulations that either were not neutral (because they overtly targeted out religious observance for worse treatment), or did not apply generally to the population, containing no exceptions the law.

156.    The *Smith* Court's animating rationale was that allowing religious exemptions to certain neutral and generally applicable laws "would be courting anarchy," *Smith*, 494 U.S. at 888, because such laws "could not function" in the face of religious exemptions, *United States v. Lee*, 455 U.S. 252, 260 (1982.

157.    That is not the case here. Childhood vaccination schemes are clearly capable of smoothly functioning with exemption options, including for religious reasons.

158.    Again, West Virginia permits many hundreds of unvaccinated children out of compliance with the CVL to remain in school, and it does not require the tens of thousands of adults working in the school system to comply with the CVL's requirements.

159.    Consequently, the government has shown through action and inaction that its infectious disease related goals can be accomplished while allowing exceptions to the CVL.

160.    Finally, the overwhelming majority of states have for decades recognized the compelling interest in respecting their citizens' religious freedoms and allow for a religious exemption option to childhood vaccination requirements, further demonstrating childhood vaccination requirements are more than capable of allowing for religious exemptions without generating the anarchy the *Smith* Court was so concerned about.

161.    Here, the option for a religious exemption mechanism can be seamlessly implemented, like it has been in forty-five other states, without endangering ordered governance and preservation of the CVL.

162.    The CVL also provokes strict scrutiny under *Smith's* progeny.[21]

163.    The *Smith* Court held that strict scrutiny would apply to regulations that either were not neutral (because they targeted religious observance) or were not generally applicable. *Smith*, 494 U.S. at 881.

164.    A couple of years later, in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), the Court outlined the parameters of the neutrality and general applicability standards when examining a local ordinance that banned animal sacrifice, a practice of the Santeria faith. Because it appeared that the government had targeted religious observance for exclusion, and because the local government allowed similar secular conduct (absence of restrictions on how hunters were to dispose of an animal carcass), the Court applied strict scrutiny and struck the ordinance. *Lukumi*, 508 U.S. at 547.

165.    More recently, the Supreme Court has protected Free Exercise rights in the face of state regulations related to infectious diseases. In *Tandon v. Newsom*, 593 U.S. 61, 62 (2021), the

---

[21] Plaintiffs also believe *Smith* was wrongly decided and preserve the right to argue *Smith* should be overturned.

Supreme Court ruled that a law is not neutral and generally applicable, and thus invokes strict scrutiny review, if it treats "*any* comparable secular activity more favorably than religious exercise." *Id.* at 62 (emphasis in original). In *Tandon,* California regulations intended to slow the spread of COVID-19 limited religious gatherings but treated comparable secular gatherings – such as getting haircuts and retail shopping – more favorably. *Id.* at 63. The Court applied strict scrutiny and granted a preliminary injunction in favor of the religious plaintiffs. *Id.* at 64.

166.    The Court employed similar reasoning in *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14 (2020), holding that a New York regulation that prohibited religious gatherings but permitted similar secular gatherings violated the First Amendment where the secular and religious activities in question presented comparable contagion risks. *Id.* at 17.

167.    A couple of months after its *Tandon* ruling, the Supreme Court examined the issue of whether a regulation is generally applicable where it provides for secular exceptions that are unavailable to citizens with religious beliefs. In *Fulton v. City of Philadelphia*, 593 U.S. 522, 537, (2021), the Court—in a 9-0 decision—held that the "creation of a formal mechanism for granting exceptions renders a policy not generally applicable" where that mechanism is unavailable to religious adherents. In deciding to apply strict scrutiny, the Court observed that the regulation in question had a procedure that was subject to individualized review and approval at the "sole discretion" of a government official. *Id.* at 537.

### F. West Virginia has Created a Discretionary Medical Exemption Process

168.    West Virginia has instituted an individualized discretionary exemption to the CVL that categorically preferences non-vaccination for secular reasons above non-vaccination for religious reasons.

169.    Students are categorically prohibited from seeking exemption from the required vaccines for religious reasons. However, students are permitted to seek a medical exemption from the required vaccines.

170.    Through the plain language of the relevant statute, West Virginia has reserved discretion to accept or deny medical exemptions.

171.    The statute dictates in relevant part that the health commissioner "is authorized to grant . . . exemptions to the compulsory immunization requirements . . . on a statewide basis, upon sufficient medical evidence that immunization is contraindicated or there exists a specific precaution to a particular vaccine." W. VA. CODE § 16-3-4 (h).

172.    It offers no similar pathway for an exemption where the requirement substantially burdens a sincerely held religious belief.

173.    The medical exemption process includes even more individualized discretion than what may be initially apparent.

174.    Under the statutory scheme, there are multiple levels of discretionary review whereby government officials and private physicians are empowered to press the red light or green light on each medical exemption request, and at each level, the government prefers non-vaccination for secular reasons above non-vaccination for religious reasons.

175.    At the first level of review, the state has delegated private health care providers discretion to determine the variety of circumstances which are eligible for a medical exemption, and those which are not.

176.    Acting on behalf of the state, these physicians conduct an individualized assessment of each request for a medical exemption and have latitude to decide whether to certify the request, and then submit their opinion for medical exemption on a government form.[22]

177.    In practice, West Virginia physicians exercise broad discretion when deciding to grant or deny each medical exemption request. Different decisions can be reached, and are reached, depending on which physician evaluates the request.

178.    If and when the medical exemption form is signed by a physician, it is then forwarded to the State Immunization Officer who reviews each medical exemption request on a case-by-case basis. If the exemption is ultimately approved by the State Immunization Officer, the student is permitted to attend school without having received all of the mandated vaccines.

179.    If the Immunization Officer denies the medical exemption, the decision can be appealed to the State Health Officer, who reviews the appeal on a case-by-case basis and determines whether to uphold or reverse the State Immunization Officer's decision. *See* W. VA. CODE § 16-3-4 (h)(4); *see also* **Exhibit 6**, Medical Exemption Denial Reconsideration Form.

180.    In practice, government officials and physicians acting on behalf of the Government exercise individualized discretion as to whether to grant or deny each medical exemption request.

181.    The criteria by which medical exemptions are evaluated are not objective and are subject to the opinion of each government official who evaluates the exemption request. Different outcomes can be reached, and are reached, depending on who reviews the request.

182.    Even the implementing regulations for the medical exemption in West Virginia provide that Defendant Dr. Christiansen shall consider "evidence from medical sources, such as

---

[22] *See* **Exhibit 12**, West Virginia Medical Exemption Request Form.

medical history, opinions, and statements about treatment the child has received." W. Va. Code R. § 64-95-17.2.a.2.

183.    A similar exemption process is unavailable to citizens with religious objections to compulsory vaccination. For example, Plaintiffs requested that they be permitted to re-enroll K.P. in the Virtual Academy with a religious exemption, but they were rejected.[23]

184.    In case there were any doubt that religious exemptions shall not be allowed, while medical exemptions are permitted, the West Virginia Department of Health's webpage outlines the process for seeking and receiving a medical exemption but makes clear that religious exemption cannot be pursued because "West Virginia does not grant non-medical exemptions."

185.    While West Virginia will not entertain a religious exemption request and forbids those tasked with enforcing the CVL to consider granting one, the State grants many medical exemptions annually.

### G.  West Virginia Permits Additional Comparable Secular Activity

186.    Defendants liberally allow for non-vaccination for secular reasons throughout the State, including in school settings.

187.    Again, Defendants allow for and do in fact grant many medical exemptions to the CVL.

188.    Defendants have granted many medical exemptions to students who attend classes in person and who interact with other students and staff significantly more frequently (indeed, every day of classroom instruction, year-round) than K.P. would as a student in the Virtual Academy.

---

[23] *See* **Exhibit 7**, Re-Enrollment and Religious Exemption Request.

189.    On belief, Defendants have also granted medical exemptions to the Virtual Academy.

190.    From a risk perspective, one online student with a medical exemption to the CVL poses the same risk to Defendants' goals as allowing Plaintiff a religious exemption – which is to say virtually no risk at all.

191.     From a risk perspective and following the government's logic, one in-person student with a medical exemption to the CVL poses a much greater risk to West Virginia's goals than allowing Plaintiffs a mechanism to pursue a religious exemption for K.P. to the Virtual Academy.

192.    Further, West Virginia does not strictly enforce its childhood vaccination policies and permit functional exemptions through non-enforcement of the CVL. In other words, as discussed *supra,* West Virginia presently permit many hundreds of students lacking one or more of the required vaccines to attend class in person, even though they are willfully non-compliant with the CVL.

193.    The government also permit teachers and staff who are not fully up to date with the required vaccines to roam freely throughout campuses across the state and intermingle with schoolchildren without showing proof of vaccination or even adhering to enhanced safety protocols.

194.    Even if the government's infectious disease related goals could logically be restricted to children, and exclusively in a school setting during school hours, West Virginia permits unvaccinated children to be educated in unlimited numbers in "learning pods," a school setting where children intermingle on a daily basis. Under W.V. Code § 18-8-1, the government permits unvaccinated children—whatever their reasons for declining vaccination—to be educated

in these learning pods. This too constitutes comparable activity under *Tandon*, and, under the government's logic, presents a considerably greater threat to West Virginia's public health goals than permitting K.P. to continue her education in the Virtual Academy with a religious exemption.

195.    Defendants also permit the public, including countless numbers of West Virginia citizens who remain unvaccinated or partially unvaccinated for any reason they choose, including secular reasons, to freely access school campuses throughout the state without vaccination-based entry restrictions.

196.    Defendants also permit unvaccinated members of the public to attend high transmissibility events in which there are large crowds gathered in close proximity, such as high school basketball and football games, without showing proof of vaccination, and then enter school campuses the next day, if desired.

197.    However, Defendants prohibit Plaintiffs from pursuing an education for K.P., even in virtual settings, based on their religious objections to the CVL.

198.    A single unvaccinated person or student on a West Virginia school campus poses a greater risk to Defendants' goals than permitting K.P. access to an online education through the Virtual Academy.

199.    Collectively, the aggregation of individual secular behaviors Defendants permit (e.g., medical exemptions, unvaccinated teachers and staff, lax enforcement of the CVL, unvaccinated children in learning pods, and unvaccinated members of the general public intermingling at high transmissibility events who then access school campuses unprohibited) pose an infinitely greater threat to any possible goals undergirding the CVL than permitting Plaintiffs' child—an online student—to access the State's educational benefits from her own home with a religious exemption to the CVL.

### H. The CVL is Amenable to Exemptions; there are Many Less Burdensome Alternatives; and the Law is Both Under- and Over-Inclusive Relative to Defendants' Infectious Disease Related Goals

200.    Every state in the country has a mandatory vaccination policy for childhood education. However, the overwhelming majority of these states—forty-five—have a process for both religious and medical exemptions to compulsory vaccination requirements.

201.    These states have demonstrated their goals undergirding vaccination requirements can be satisfied while simultaneously respecting students' religious freedoms.

202.    In short, the CVL can be seamlessly implemented without endangering West Virginia's disease mitigation goals while also allowing for exceptions to the policy.

203.    Universal vaccination is not the only disease prevention tactic that can be deployed. States with a religious exemption process deploy a variety of alternative tactics, such as quarantine in the event of an outbreak, or face masking, distancing, sanitation, and others. Notably, the states contiguous to West Virginia that allow for religious exemptions to childhood vaccination laws all implement the less restrictive alternative of quarantining, if an outbreak of an infectious disease were ever to occur.[24]

---

[24] *See*, *e.g.*, 28 Pa. Code § 27.77(e) (Pennsylvania: "Whenever one of the diseases … has been identified within a child care group setting, the [health] Department … may order the exclusion from the child care group setting …which is determined to be at high-risk of transmission of that disease, of an individual susceptible to that disease in accordance with public health standards …"); Kentucky Exemption Form ("In the event that the county health department or state health department declares an outbreak of a vaccine-preventable disease for which proof of immunity for a child cannot be provided, he or she may not be allowed to attend childcare or school for up to three (3) weeks, or until the risk period ends.") *available at* https://www.chfs.ky.gov/agencies/dph/dehp/imm/EPID230a.pdf; Md. Code Regs. 10.06.04.05(B) (Maryland: "The exemption allowed under … this regulation does not apply when the Secretary declares an emergency or epidemic of disease"); Oh. Rev. Code § 3313.671(C) (Ohio: "a school may deny admission to a pupil otherwise exempted from the chicken pox immunization requirement if … a chicken pox epidemic exists in the school's population. The denial of admission shall cease when the director notifies the principal … that the epidemic no longer exists"); 12 Va. Admin Code 5-110-80(A)(3) (Virginia: "Upon the identification of an outbreak, potential epidemic, or epidemic of a vaccine-preventable disease in a public or private school, the commissioner has the authority to require the exclusion from such school of all children who are not immunized against that disease.").

204.    West Virginia does not even require any of these countermeasures for children with medical exemptions, or for unvaccinated teachers and staff working in the school system. Indeed, if vaccination is effective against transmission of disease, as West Virginia claims is the justification for the CVL, then a handful of religious exemptions for in-person students would present absolutely no risk to the remaining vaccinated students who attend school in person, particularly assuming as true Defendants position that the mandated vaccines work.

205.    Plaintiffs will comply with any reasonable, less burdensome alternatives that would allow them to continue pursuing their child's online education.

206.    Moreover, the CVL also fails to regulate enough conduct to satisfy West Virginia's goals. In short, the CVL is glaringly and substantially underinclusive relative to the objectives the government seeks to achieve.

207.    For example, sporting events on West Virginia school campuses, graduation ceremonies, or any other student and/or community gatherings do not require proof of vaccination.

208.    These mass gatherings pose a significantly greater risk to West Virginia's  goals to mitigate against infectious disease spread than would permitting K.P. to pursue her online education with a process for obtaining a religious exemption.

209.    Notwithstanding being ejected from the Virtual Academy, however, K.P. can attend sporting events, just as any other member of the public can and does. As such, the CVL does not mitigate against the purported risk of transmission on campuses, and therefore, it is severely underinclusive. This is true, even when engaging in the fiction that all the required vaccines are capable of preventing infection and transmission of the targeted pathogens, given that CDC and other public health authorities document breakthrough infections following receipt of several of the required vaccines.

42

210.    The CVL is also underinclusive because it permits medical exemptions for students (both online and in person). The CVL is underinclusive relative to West Virginia's objectives because it permits unvaccinated online and in-person students possessing medical exemptions to receive an education throughout the state.

211.    If a student with a medical exemption can safely attend in-person class every single school day of instruction, then K.P., an online student, can certainly complete her education with a religious exemption without endangering the government's goals.

212.    The CVL is further substantially underinclusive because West Virginia does not require vaccines meant to protect from highly contagious viruses spread via respiratory secretions, such as COVID-19 and influenza, which are arguably more lethal and result in more hospitalizations every year than those diseases for which vaccines are required under the CVL.

213.    In fact, West Virginia outright prohibits requiring COVID-19 vaccines as a condition of entering school. *See* W.V. Code §§ 16-3-4b, 16-3-4c.

214.    The CVL is also overbroad because it captures more conduct than necessary to achieve its goals.

215.    First, the CVL fails to include a reasonable religious exemption for the miniscule fraction of families who, like Plaintiffs, hold sincere religious beliefs in conflict with the CVL and who desire to enroll their children in the Virtual Academy.

216.    Second, assuming the required vaccines provide the protection that Defendants claim and considering that the overwhelming majority of West Virginia families have vaccinated their children in compliance with the CVL, Defendants do not meaningfully advance their goals by forcing Plaintiffs to violate their sincerely held religious beliefs by injecting K.P. with the required vaccines as a condition of education. While the Government may have a compelling

interest in the abstract, that does not mean that it has one "in each marginal percentage point by which" it achieves its general goals. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 803 n.9 (2011).

217.    Third, the Policy is overbroad because many of the required vaccines, including pertussis, tetanus, diphtheria, polio, and meningococcal do not prevent transmission or infection of the diseases they target. *See supra,* §I.B. Rather, these vaccines merely provide a level of personal protection by potentially preventing recipients from experiencing the symptoms of these infections.

218.    Fourth, K.P. has received doses of the vaccines required under the CVL. Thus, West Virginia can only, at best, point to miniscule gains to its disease mitigation goals by forcing K.P. to receive the few additional doses she lacks.

219.    However, despite these realities, the government has completely destroyed the option for religious objections in the compulsory vaccination arena, including in the virtual school setting, a plainly overbroad application of its justification for requiring vaccination to mitigate the spread of infectious diseases.

## COUNT I

### 42 U.S.C. § 1983
### VIOLATION OF PLAINTIFF'S FIRST AMENDMENT FREE EXERCISE RIGHTS
### For Declaratory and Injunctive Relief (as applied challenge to the CVL)

220.    Plaintiffs incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

221.    The First Amendment of the U.S. Constitution provides that: "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." This clause has been incorporated against the states. *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

222.    The Supreme Court recently reaffirmed that the First Amendment's Free Exercise Clause "does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421 (2022) (quoting *Smith,* 494 U. S. at 877)).

223.    The Supreme Court has repeatedly recognized that "[t]he free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Smith*, 494 U.S. at 877.

224.    Parents have the right to "direct the religious upbringing of their children" and "when the interests of parenthood are combined with a free exercise claim […] more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment." *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972).

225.    Courts should not inquire into the validity or plausibility of a person's beliefs; instead, the task is to determine whether "the beliefs professed [] are sincerely held and whether they are, in [a believer's] own scheme of things, religious." *United States v. Seeger*, 380 U.S. 163, 185 (1965).

226.    The "guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect." *Thomas v. Review Bd. of Ind. Emp't Sec. Div*., 450 U.S. 707, 715-16 (1981).

227.    Plaintiffs' sincerely held religious beliefs that prohibit them from vaccinating their minor child have been unconstitutionally burdened by the State of West Virginia. Plaintiffs'

attempts to maintain K.P.'s enrollment in the Virtual Academy with a religious exemption request were rejected.

228.    As such, West Virginia has pitted Plaintiffs' religious integrity against educating their child. West Virginia has created a system of public education whereby it guarantees an education to every student. *See, e.g., Pauley*, 162 W. Va. at 707 (holding that "[t]he mandatory requirements of 'a thorough and efficient system of free schools' found in . . . the West Virginia Constitution, make education a fundamental, constitutional right in this State." *see also State v. Beaver*, No. 22-616, at *36 ("Both the State Constitution and [West Virginia courts] have established that education is a fundamental right").

229.    The Free Exercise Clause of the First Amendment protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson v. Makin*, 142 S. Ct. 1987 (2022) (quoting *Lyng v. Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 450 (1988)). "In particular, [the U.S. Supreme Court has] repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Id.*

230.    Nevertheless, despite West Virginia's guarantee of a free public-school education, K.P. cannot obtain a formal education because of her parents' convictions, not in public school, private school, or even the Virtual Academy.

231.    However, West Virginia families with secular, medical motivations for declining compulsory immunization can be exempted from the CVL's requirements. Those exempt children are then free to attend class in person.

232.    Considering the foregoing, and directly on-point Supreme Court precedent, the CVL provokes and cannot survive strict scrutiny.

***The CVL Triggers Strict Scrutiny under Smith***

233.    The CVL substantially burdens Plaintiffs' religious beliefs and practices, and the law triggers strict scrutiny under *Smith,* 494 U.S. at 888, because the State has shown the CVL is readily amenable to exceptions to the state's vaccination policy. The prohibition of a religious exemption option, despite the reality of a feasible exemption scheme, reveals the CVL's lack of neutrality and lack of general applicability under *Smith.* Because the CVL is readily amenable to a religious exemption option, the law triggers strict scrutiny.

234.    The State of West Virginia has made an unconstitutional value judgment that secular (*i.e.*, medical) motivations for opting out of compulsory immunization are permitted, but that religious motivations are not.

***The CVL Clearly Triggers Strict Scrutiny on Additional Grounds under Smith's Progeny***

235.    Further, should the Court determine the CVL does not trigger strict scrutiny under *Smith* because the law is readily amenable to a religious exemption option, the CVL fails both the general applicability and neutrality tests under *Smith's* progeny.

236.    While West Virginia may have a general healthcare interest in promoting childhood immunization, the First Amendment's Free Exercise Clause prohibits the government from enacting non-neutral and non-generally applicable legislation unless it is narrowly tailored to a compelling government interest. *Lukumi*, 508 U.S. at 531.

237.    The CVL fails the general applicability test under *Fulton* because the medical exemption system provides for individualized discretionary review. "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable . . . ." *Fulton,* 593 U.S. at 537.

47

238.    In such instances, the government may not refuse to extend the possibility for an exemption "to cases of religious hardship without compelling reason." *Id.* at 534 (cleaned up).

239.    Because its medical exemption process provides for discretionary review at multiple levels, West Virginia's CVL fails the general applicability test. West Virginia has instituted a system of customized review – delegated first to private physicians and second to the State Immunization Officer and the Health Officer – who at each level conduct individualized review of medical exemption requests.

240.    The CVL also fails the neutrality test because the government made a categorical choice to prohibit the option for religious exemptions in virtual settings and in private schools, but it made the deliberate choice to maintain the medical exemption option. On March 29, 2024, Governor Jim Justice vetoed a bill that would have allowed for religious exemptions in the Virtual Academy. Conclusively demonstrating its non-neutrality and animus towards any possibility of religious observance in the compelled vaccination arena, the government made the deliberate choice that non-vaccination for religious reasons, even in virtual learning settings, cannot be tolerated, whole continuing to allow for secular exemptions to the CVL for in-person students.

241.    The CVL also fails the general applicability and neutrality tests on alternative grounds because West Virginia treats non-vaccination for secular reasons more favorably than non-vaccination for religious reasons.

242.    Government regulations "are not neutral and generally applicable, and therefore trigger strict scrutiny under the free exercise clause of the First Amendment, whenever they treat **any** comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62 (emphasis in original).

243.    Whether two activities are comparable for purposes of the free exercise clause depends on "the asserted government interest that justifies the regulation at issue." *Id.*

244.    Here, with regard to regulating the conduct of its secular and religious citizens, the government holds the same interest in mitigating against infectious disease in school settings. Further, the secular and religious activities at issue are not only comparable, but they are also exactly the same (non-vaccination).

245.    A law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton,* 593 U.S. at 534 (cleaned up).

246.    Whatever interest West Virginia may have in promoting childhood vaccination, its interests are not so extraordinary as to prohibit an exemption for secular reasons, and hence can similarly provide an exemption for religious reasons, particularly for students who only attend online classes. Further, West Virginia liberally allows functional exemptions through non-enforcement of the CVL, and it does not prohibit unvaccinated children from visiting public libraries or museums, or from interacting with their peers in any other way. Nor does West Virginia require that teachers, staff members, or school visitors provide proof of vaccination. West Virginia also allows unvaccinated students to be educated in learning pods in unlimited numbers.

247.    These activities in which West Virginia permits non-vaccination for secular reasons, each in isolation pose a greater threat to its infectious disease-related goals than would permitting K.P. to be educated with a religious exemption. Collectively, these activities pose a dramatically greater threat under the *Tandon* framework and thus invoke strict scrutiny under the First Amendment on additional grounds.

***The CVL Infringes on Other Constitutionally Protected Rights and also Triggers Strict Scrutiny because it Implicates Hybrid Rights***

248.    In *Yoder*, 406 US at 234-35, the Supreme Court acknowledged that Free Exercise rights can overlap with and can be inherently intertwined with the right to make decisions regarding the upbringing of one's child as recognized in *Pierce v. Socy. of Sisters*, 268 U.S. 510 (1925). There, the Court reached this conclusion due to the Amish's "religious beliefs, the interrelationship of belief with their mode of life, the vital role that belief and daily conduct play in the continued survival of … Amish communities and their religious organization, and the hazards presented by the State's enforcement of a statute generally valid as to others." *Id.* at 235.

249.    In such circumstances, "when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a reasonable relation to some purpose within the competency of the State is required to sustain the validity of the State's requirement under the First Amendment" (i.e., requires the application of strict scrutiny). *Yoder*, 406 U.S. at 233. *See also Smith*, 494 U.S. at 881-81 (acknowledging hybrid rights that triggered strict scrutiny).

250.    Here, the CVL implicates Plaintiffs' right to free exercise as well as their right to free speech, to associate, and to regulate the upbringing and education of K.P. These provide independent reasons for applying strict scrutiny to the CVL in Plaintiffs' specific case.

***The CVL Fails Strict Scrutiny***

251.    For the reasons detailed throughout, West Virginia lacks a sufficiently compelling interest to enforce the CVL against Plaintiffs specifically.

252.    Whatever interests West Virginia may advance in support of its law, its interests are not so compelling as to prohibit secular exceptions. As applied to Plaintiffs, the government lacks a sufficiently compelling interest to restrict Plaintiffs' religious freedoms because this case

involves a student attending a course of instruction that occurs online in which the child is physically located in their own home.

253.    A law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited (e.g., here, granting medical exemptions for students physically attending school, permitting functional exemptions through lax enforcement, and by allowing adults out of compliance with the CVL to work in the educational system).

254.    Further, Defendants cannot rely on a broad policy goal, but must demonstrate a compelling interest in denying a religious exemption to K.P. specifically – a remote student who was enrolled in Virtual Academy for more than seventeen months before she was excluded.

255.    In reviewing refusal of a religious exemption, courts cannot "rely on 'broadly formulated interests'"; instead "courts must 'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants.'" *Fulton,* 593 U.S. at 541 (cleaned up).

256.    Thus, the "question, then, is not whether the [West Virginia] has a compelling interest in enforcing its" vaccination "policies generally, but whether it has such an interest in denying an exception to" Plaintiffs. *Id.*

257.    Even if West Virginia could substantiate a sufficiently compelling interest to enforce the CVL specifically against Plaintiffs and specifically to exclude K.P. from the Virtual Academy, the law still fails strict scrutiny.

258.    For the reasons detailed throughout, CVL Policy also is not narrowly tailored, is overinclusive, and substantially underinclusive, and therefore fails strict scrutiny on these additional grounds.

259.    West Virginia's CVL cannot withstand strict scrutiny because it is not narrowly tailored. In the context of government regulations targeting infectious disease, "narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest." *Tandon*, 593 U.S. at 63. Where utilization of such less restrictive means is required, the government "may no more create an underinclusive statute, one that fails truly to promote its purported compelling interest, than it may create an overinclusive statute, one that encompasses more protected conduct than necessary to achieve its goal." *Lukumi,* 508 U.S. at 578.

260.    Regarding under-inclusivity, where the government permits secular activities, such as a medical exemption, "it must show that the religious exercise at issue is more dangerous." *Tandon*, 593 U.S. at 63.

261.    When a law is over-inclusive, its "broad scope . . . is unnecessary to serve the interest, and the statute fails for that reason." *Lukumi*, 508 U.S. at 578.

262.    West Virginia's CVL cannot withstand heightened scrutiny because it is both over-inclusive and under-inclusive relative to the state interests it purportedly attempts to achieve. Instead of regulating with the precision necessary to avoid conflict with its citizens' free exercise rights, West Virginia eliminated every possibility for religious observance in the mandatory vaccination arena.

263.    West Virginia's compulsory vaccination scheme is under-inclusive because it only applies to children in a school setting. The mandate does not apply to non-school attending children (who regularly interact with their peers) nor to adults in the state, who comprise over 80 percent of West Virginia's population.

264.    The CVL is also under-inclusive because children possessing a religious exemption would pose no greater threat than their secular peers with a medical exemption. Moreover, the immunization requirements do not apply to adults who are employed in West Virginia's school system, or to school visitors.

265.    Further, the existence of a religious exemption for attending school would have an immaterial impact in the number of individuals vaccinated in West Virginia. Nor would the existence of a religious exemption materially impact the overall percentage of vaccinated school children.

266.     Given that West Virginia boasts one of the highest vaccination rates in the country, allowing a religious exemption for a handful of students, just as secular medical exceptions are permitted, would constitute an actual attempt at narrow tailoring.

267.    Because West Virginia's CVL is simultaneously too narrow and too broad to fulfill the government interests it supposedly attempts to accomplish, and considering that forty-five other states have religious exemption options, the regulation lacks the narrow tailoring necessary to survive strict scrutiny review.

268.    Accordingly, the CVL fails strict scrutiny and, at least as applied to online students such as K.P., would fail even rational basis review.

269.    Therefore, as applied specifically to Plaintiffs, the CVL violates Plaintiffs' right to free exercise of religion.

**Plaintiffs Have Suffered and Continue to Suffer Irreparable Harm**

270.    "The loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Because of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm.

271.    Absent injunctive and declaratory relief against the CVL and injunctive relief against Defendants, Plaintiffs will have been and will continue to be harmed.

272.    Plaintiffs are entitled to a declaration that Defendants violated and continue to violate their First Amendment rights to free exercise of religion and an injunction against Defendants' actions as they relate to West Virginia's CVL.

## INJUNCTIVE RELIEF ALLEGATIONS

273.    Plaintiffs incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

274.    Plaintiffs allege that, as applied, the CVL violates their First Amendment rights and her right to be free from unlawful statutes.

275.    Plaintiffs are being and will continue to be irreparably harmed unless this Court enjoins Defendants from enforcing the CVL against K.P.

276.    Plaintiffs have no plain, speedy, and adequate remedy at law to prevent Defendants from enforcing the CVL against K.P.

277.    If not enjoined by this Court, Defendants will continue to implement and enforce the CVL in violation of Plaintiffs' constitutional rights.

278.    Accordingly, injunctive relief is appropriate.

## DECLARATORY RELIEF ALLEGATIONS

279.    Plaintiffs incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

280.    Plaintiffs are entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201. An actual and substantial controversy exists between Plaintiffs and Defendants as to their legal rights

and duties with respect to whether West Virginia's CVL, which allows for secular but not religious exemptions to the Virtual Academy, violates the United States Constitution.

281.   The case is presently justiciable because the CVL and absence of any religious exemption to the same applies to Plaintiffs and K.P., who is currently harmed by being excluded from the Virtual Academy.

282.   Declaratory relief is therefore appropriate to resolve this controversy.

## PRAYER FOR RELIEF

283.   Pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983, it is appropriate and proper that a declaratory judgment be issued by this Court, declaring that the CVL is unconstitutional as applied to Plaintiffs.

284.   Pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, and 42 U.S.C. § 1983 it is appropriate and hereby requested that the Court issue preliminary and permanent injunctions prohibiting Defendants from enforcing the CVL against Plaintiffs, unless the government allows for religious exemption option for Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants and provide Plaintiffs with the following relief:

A.    Declare the "no religious accommodation" policy to the CVL, as applied specifically to Plaintiffs, unconstitutional;

B.    Issue a preliminary and permanent injunction prohibiting Defendants, their agents, servants, employees and any other persons acting on their behalf from enforcing W. VA. CODE § 16-3-4 against Plaintiffs, unless the government provides an option for Plaintiffs to request a religious exemption to the Virtual Academy;

C.  Declare that W. VA. CODE § 16-3-4 is unconstitutional as applied specifically to Plaintiffs;

D.  Declare that W. VA. CODE § 16-3-4, as applied specifically to Plaintiffs, has violated and continues to violate Plaintiffs' First Amendment right to free exercise of religion;

E.  Grant Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and any other applicable authority; and

F.  For any such other and further relief as the Court deems equitable and just under the circumstances.

Dated: July 5, 2024.                    Respectfully submitted,

                                        JOHN H. BRYAN LAW

                                        /s/ *John H. Bryan*
                                        _____
                                        John H. Bryan, Attorney
                                        West Virginia Bar No. 102159
                                        411 Main Street
                                        P.O. Box 366
                                        Union, West Virginia 24983
                                        Tel: (304) 772-4999
                                        jhb@johnbryanlaw.com


                                        SIRI & GLIMSTAD LLP

                                        Aaron Siri, Attorney*
                                        Elizabeth A. Brehm, Attorney*
                                        Walker D. Moller, Attorney*
                                        745 Fifth Ave, Suite 500
                                        New York, NY 10151
                                        Tel: (212) 532-1091
                                        Fax: (646) 417-5967
                                        aaron@sirillp.com
                                        ebrehm@sirillp.com
                                        wmoller@sirillp.com

Christopher Wiest, Attorney*
25 Town Center Blvd., Suite 104
Crestview, KY 41017
Tel: (513) 257-1895
Fax: (859) 495-0803
chris@cwiestlaw.com

*Attorneys for Plaintiff*

\**pro hac vice* to be submitted

## **VERIFICATION**

I, Krystle Perry, a citizen of the United States and of West Virginia, have read the foregoing

Complaint and know the contents thereof as to myself and my minor child, K.P., and that the facts

therein that relate to me and K.P., are true to my knowledge and as to all other matters on

information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on July 4, 2024, in Oak Hill, West Virginia.

Krystle Perry

## VERIFICATION

I, Anthony Perry, a citizen of the United States and of West Virginia, have read the foregoing Complaint and know the contents thereof as to myself and my minor child, K.P., and that the facts therein that relate to me and K.P., are true to my knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on July 4, 2024, in Oak Hill, West Virginia.

_anthony perry_
Anthony Perry