IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KRYSTLE PERRY and
ANTHONY PERRY, *individually and*
*on behalf of their minor child K.P.*,

        Plaintiffs,

v.
                                              CIVIL ACTION NO. 2:24-cv-18
                                              JUDGE KLEEH

STACY MARTENEY *in her official capacity*
*as the Virtual Learning Coordinator of the*
*Upshur County Virtual School;* THE BOARD
OF EDUCATION OF THE COUNTY OF
UPSHUR; CHRISTINE MILLER, *in her*
*official capacity as Superintendent of the*
*Upshur County School District*; DR. MATTHEW
CHRISTIANSEN, *in his official capacities as*
*the State Health Officer and Commissioner of the*
*Bureau of Public Health;* and BRYAN HOYLMAN
*in his official capacity as Chair of the Board of*
*Directors of Mountain State Learning Solutions, Inc.,*
*d/b/a West Virginia Virtual Academy*,

        Defendants.

**STATUS REPORT OF DEFENDANTS**

        Pursuant to this Court's January 31, 2025, Order (ECF No. 67), the Defendants hereby submit the following status update:

        1.     The primary issue in this case is whether W. Va. Code § 16-3-4 is unconstitutional under a Free Exercise Clause challenge of the First Amendment, as applied to Plaintiff K.P., where Plaintiff is a virtual student in Upshur County Virtual School.  *See* ECF No. 1.

2.      On January 14, 2025, West Virginia Governor Morrisey issued Executive Order 7-25, stating that the absence of a religious exemption in W. Va. Code § 16-3-4 substantially burdens the free exercise of religion in violation of the Equal Protection for Religion Act of 2023 and the "inherent religious liberties guaranteed by the Constitutions of the United States and West Virginia." *See* ECF No. 65, Exhibit A.

3.      This Executive Order further ordered that the State Health Officer submit a plan to the Governor's office regarding the proposal of any necessary legislation and rules to enable and facilitate a statewide exemption to W. Va. Code § 16-3-4. *Id*.

4.      On January 22, 2025, the parties filed a joint motion to stay all proceedings due to the West Virginia Governor Morrisey's recent Executive Order No. 7-25 dated January 14, 2025. *See* ECF No. 65.

5.      On January 31, 2025, this Court granted the joint motion to stay and directed the parties to submit monthly joint status reports beginning on February 28, 2025. *See* ECF No. 67.

6.      During the West Virginia legislative session, multiple attempts were made to modify W. Va. Code § 16-3-4 to include religious and philosophical exemptions to the State's mandatory vaccination requirements for school children. However, no such legislation was enacted during the legislative session, which concluded on April 12, 2025.

7.      On May 9, 2025, Governor Morrisey issued a letter setting forth guidelines for seeking a religious or moral exemption, and saying that despite the legislative hurdle, the executive order "still stands, and I have no intention of rescinding it."

8.      Although the legislative session has concluded, Governor Morrisey has the constitutional authority to invoke an extraordinary legislative Session pursuant to Article VII-7-7 of the Constitution of West Virginia.

9.      Further, Governor Morrisey has preliminarily indicated that he intends to call an extraordinary legislative session regarding the Public Employees Insurance Agency (PEIA).[1]

10.     Because the Governor has not yet issued a proclamation pursuant to Article VII-7-7 of the West Virginia Constitution, it remains to be seen whether Governor Morrisey intends to include other legislative matters in this anticipated extraordinary legislative session, including the changes to W. Va. Code § 16-3-4 that Governor Morrisey's Executive Order 7-25 sought to implement.

11.     At the time of this Status Report, the Governor's Executive Order 7-25 remains in effect.

12.     Additionally, the American Civil Liberties Union ("ACLU") of West Virginia and Mountain State Justice, Inc. recently filed a *Petition for Writ of Mandamus* ("Petition for Writ")[2] on behalf of two parents of immunocompromised children in a circuit court seeking a Writ of Mandamus against the West Virginia Department of Health, the West Virginia Bureau for Public Health, the interim Commissioner for Public Health, and the West Virginia Department of

---

[1]    *See*   https://westvirginiawatch.com/2025/04/24/morrisey-says-hell-call-special-session-for-peia/   (last accessed April 28, 2025).

[2]    Filed on May 23, 2025, this civil action is styled *Marisa Jackson and Joshua A. Hess* ("Petitioners") *v. W. Va. Dept. of Health, W. Va. Bureau for Public Health, Justin Davis, Interim Commissioner for Public Health, Arvin Singh, W. Va. Dept. of Health Cabinet Secretary,* Civil Action No. 2025-P-253, in the Circuit Court of Kanawha County, West Virginia.

Health Cabinet Secretary (collectively, "Respondents").  In news articles about the same, ACLU-West Virginia legal director Aubrey Sparks has been quoted as saying "Governors do not rule by decree … . At the center of this lawsuit is who gets to make these decisions for our students.  On this question, the state Constitution is clear that the authority lies with the Legislature, not the governor."

13.    The Petition for Writ asserts that the Petitioners have a clear right to relief; that the Respondents have a legal duty to enforce West Virginia's compulsory immunization statute; and that Petitioners lack another adequate remedy at law.

14.    The Petition for Writ seeks a Writ of Mandamus directing Respondents "to fully comply with W. Va. Code § 16-3-1 *et seq.* notwithstanding Executive Order 7-25 and bar Respondent[s] from awarding any exemptions that conflict with the statute."

15.    The Petition for Writ also seeks a declaration that "Respondents' policy of permitting exemptions to requirements that are contrary to W. Va. Code § 16-3-1 *et seq.* are unlawful and invalid."

16.    Less than two weeks ago, a West Virginia parent sued under West Virginia's Equal Protection for Religion Act (EPRA), W. Va. Code § 35-1A-1, in West Virginia state court to permit vaccine exemptions on religious grounds.[3]

17.    While this fact was mentioned in Plaintiffs' status report [Doc. 76], Plaintiffs fail to mention to this Court that the same exact attorneys representing Plaintiffs in this

---

[3] https://wvpublic.org/backed-by-governor-raleigh-county-mom-sues-for-religious-vaccine-exemption/ (last accessed June 30, 2025).

matter are representing the plaintiffs in the *Raleigh County* matter, which seeks a ruling from the State Court that W. Va. Code § 16-3-4 violates the EPRA because it does not provide religious exemptions.  A copy of this Complaint is attached hereto as Exhibit A.

18.     Indeed, the resolution of the *Raleigh County* matter could effectively moot the matter before this Court if the state court finds that West Virginia's compulsory vaccination law violates the EPRA.

19.     In previous status reports filed before this Court, the parties have agreed to continue the stay given the various events that have been unfolding which has provided uncertainty as to whether this matter may be resolved without this Court's intervention.

20.     The appellate matter involving this Court's Preliminary Injunction Order (No. 24-2132) has been stayed since alongside this matter.

21.     On Friday, June 27, 2025, the parties met and conferred concerning this status report.  The undersigned communicated Defendants' desire to lift the stay on the appellate matter, only, as all that is required for that matter to be fully ripe before the Court is the completion of briefing.  Initially, Plaintiffs communicated that they desired to continue the stay on both matters, citing the uncertainty as to the status of West Virginia's compulsory vaccination law and current events as discussed herein.

22.     On Monday, June 30, 2025, the parties met and conferred again wherein Plaintiffs now expressed their desire to lift the stay on this matter unless Defendants agreed to continue the stay in appellate matter.  Ultimately, the parties reached an impasse which has necessitated the need to file separate status reports for these matters.

23.     Good cause remains to continue the stay in this matter, because, as Plaintiffs acknowledge, there is another matter that is being adjudicated in West Virginia state courts regarding vaccine exemptions on religious grounds (which is being litigated by the same counsel), the Governor's Executive Order 7-25 remains in effect, and Plaintiff K.P. continues to be enrolled in school.

24.     Furthermore, Plaintiffs' position that it would be "prejudicial to Plaintiffs if they did not have the ability to advance a trial resolution before this Court towards a final decision" is not only confusing, but completely ignores the fact that Defendants have complied, and will continue to comply, with the Preliminary Injunction Order issued by this Court.

25.     Clearly, Plaintiffs are ***not*** prejudiced in anyway by the continuation of the stay in this matter because Plaintiff K.P. will continue to be permitted to be enrolled pending resolution of this matter before this Court.  Allowing the Fourth Circuit to resolve the legal issue that is at the heart of this matter (whether §16-3-4 is constitutional applied to Plaintiff K.P.) serves the interests of both parties as this case will be effectively resolved regardless of whether the Preliminary Injunction Order is overruled or affirmed by the Fourth Circuit.

26.     Resuming the litigation in this matter (where the parties were in the middle of extensive discovery and motions practice) and resuming the litigation in the appellate matter (where the only thing left to do was complete briefing) are two drastically different things and Plaintiffs "all or nothing" serves no judicial purpose, as illustrated by their inability to demonstrate how they are actually prejudiced by the continuation of the stay when Plaintiff K.P. is already enrolled in school and receiving the very relief they are seeking in a final resolution.

27.     For these reasons, Defendants believe that continuation of the stay in this matter for another thirty (30) days is appropriate as it provides for an efficient use of judicial resources and Plaintiffs are not harmed or prejudiced in any way by the continuation of the stay.

*/s/ Ryan S. Moore* _____
Robert J. Kent (5010)
Ryan S. Moore (14155)
Bowles Rice LLP
Fifth Floor, United Square
501 Avery Street, Post Office Box 49
Parkersburg, WV  26102
(304) 420-5515
Facsimile (304) 420-5587
rkent@bowlesrice.com
rmoore@bowlesrice.com

Leigh Anne Wilson (13927)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, WV  26501
(304) 554-2603
Facsimile (304) 285-2530
lwilson@bowlesrice.com

*Counsel for Defendants Stacy Marteney, in her official capacity and Christine Miller, in her official capacity*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the parties in this case.

*/s/ Ryan S. Moore*
Ryan S. Moore

17751701.1

E-FILED | 6/24/2025 10:49 AM
CC-41-2025-C-230
Raleigh County Circuit Clerk
Brianne Steele

**IN THE CIRCUIT COURT OF RALEIGH COUNTY, WEST VIRGINIA
FOURTEENTH JUDICIAL CIRCUIT**

| | |
|---|---|
| MIRANDA GUZMAN, *individually and on behalf of her minor child A.G.,* | |
| Plaintiff, | Civil Action No.: _____ |
| v. | |
| WEST VIRGINIA BOARD OF EDUCATION; NANCY J. WHITE, *in her official capacity as President of the Board of Education*; VICTOR GABRIEL, F. SCOTT ROTRUCK, L. PAUL HARDESTY, ROBERT W. DUNLEVEY, CHRISTOPHER STANSBURY, DEBORAH SULLIVAN, GREGORY WOOTEN, AND CATHY JUSTICE, *all in their official capacities as members of the West Virginia Board of Education;* MICHELE BLATT, *in her official capacity as State Superintendent of Schools*; RALEIGH COUNTY BOARD OF EDUCATION; LARRY FORD, RICHARD SNUFFER, CHARLOTTE HUTCHENS, MARIE HAMRICK, and MARSHA SMITH, *all in their official capacities as members of the Raleigh County Board of Education; and* SERENA L. STARCHER, *in her official capacity as Superintendent, Raleigh County Board of Education,* | **VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendants. | |

**EXHIBIT
A**

1

## INTRODUCTION

1.      This case evokes unpleasant memories from our country's past because Defendant school officials are essentially standing in the schoolhouse door defiantly interfering with controlling law and blocking Plaintiff—a widow—from sending her child, A.G., to school.

2.      West Virginia's Supreme Court of Appeals has held that "[t]he mandatory requirements of 'a thorough and efficient system of free schools' found in . . . the West Virginia Constitution, make education a fundamental, constitutional right in this State." *Pauley v. Kelly*, 162 W. Va. 672, 707 (1979); *see also State v. Beaver*, No. 22-616, 2022 W. Va. LEXIS 700, *36 (W. Va. 2022) ("Both the State Constitution and [West Virginia courts] have established that education is a fundamental right"); *see also Goss v. Lopez,* 419 U.S. 565, 95 (1975) (holding when state law creates a right to public education, that right becomes protected by the Due Process Clause of the Fourteenth Amendment).

3.      But despite the fundamental right to receive an education in this State, A.G. has nevertheless been excluded from West Virginia's educational system because of Plaintiff's religious beliefs and is unable to access the practical and social benefits of a formal education that her secular peers enjoy.

4.      This is because in West Virginia it is unlawful for any child to attend "any of the schools of the state or a state-regulated childcare center until he or she has been immunized against chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and whooping cough" and "[n]o person shall be allowed to enter school without at least one dose of each required vaccine." W. Va. Code § 16-3-4 (c) and (e) ("the **Compulsory Vaccination Law**" or "**CVL**"). The State Health Officer and other public health officials within the West Virginia

Department of Health regulate whether schoolchildren are following the Compulsory Vaccination Law. *See generally* W. Va. Code § 16-3-4.

5.    West Virginia's interest in mandating that schoolchildren are vaccinated, however, certainly is not absolute, as evidenced by the fact that the State permits discretionary secular medical exemptions from the Compulsory Vaccination Law. *See id.* at § 16-3-4 (h) (providing that public health officials may grant a medical exemption "upon sufficient medical evidence that immunization is contraindicated or there exists a specific precaution to a particular vaccine.").

6.    Similar to language in the U.S. Constitution that vests in the President unitary executive authority to enforce federal law, the West Virginia Constitution vests solely in the Governor "chief executive power" to generally enforce State law, entrusting the Governor to "take care that the laws be faithfully executed." W. Va. Const. art. VII, § 5 (1872).

7.    Faithfully executing his duty to uphold the law, on January 14, 2025, Governor Patrick Morrisey issued Executive Order 7-25 on January 14, 2025 ("**Executive Order**") pursuant to his exclusive chief executive power under the State Constitution's Take Care Clause to enforce West Virginia law, including the West Virginia Equal Protection for Religion Act enacted by the Legislature in 2023, W.V. Code 35-1A-1 ("**EPRA**"), other applicable sections of the West Virginia Constitution, precedent of the West Virginia Supreme Court, and certain litigation and rulings in federal court including in *Perry v. Marteny*, NDWV, 2:24-cv-00018-TSK. A true and accurate copy of the Executive Order is attached hereto as **Exhibit 1**.

8.    To enforce the EPRA, Governor Morrisey's Executive Order directed the State Health Officer and other officials in the West Virginia Department of Health to establish a religious exemption process so parents could request that their children be exempt from the Compulsory Vaccination Law based on their religious beliefs.

3

9.      In response, West Virginia Department of Health officials properly implemented Governor Morrisey's lawful Executive Order and began to issue certificates of exemption from mandatory vaccination to children so they could attend school.

10.     A.G. received a religious exemption certificate from the State Health Department, exempting her from the CVL's mandatory vaccination scheme because the CVL substantially burdened Plaintiff's exercise of religion including her religious beliefs to not vaccinate her child. Attached as **Exhibit 2** is a true and correct copy of A.G.'s religious exemption certificate.

11.     Plaintiff then enrolled A.G. in Clear Fork District Elementary School, a PK-5 elementary school in Raleigh County, for the upcoming 2025-26 school year

12.     But thereafter, Defendants West Virginia Board of Education, by and through its members Nancy White, Victor Gabriel, F. Scott Rotruck, L. Paul Hardesty, Robert W. Dunlevey, Christopher Stansbury, Deborah Sullivan, Gregory Wooten, and Cathy Justice; and its Superintendent Michele Blatt, (collectively the "**State Board Defendants**"), decided to issue a directive to school districts in the State advising them to *not* honor Governor Morrisey's Executive Order, and to *not* permit unvaccinated children—like A.G.—to attend school despite them receiving a valid religious exemption certificate from the State Health Officer.

13.     The Raleigh County Board of Education, by and through its school board, composed of Defendants Larry Ford, Richard Snuffer, Charlotte Hutchens, Marie Hamrick, and Marsha Smith, and its Superintendent, Serena Starcher (collectively the "**Local Board Defendants**"), is following this illegal directive of the State Board Defendants and disregarding the Governor's Executive Order, excluding unvaccinated children with a valid religious exemption certificate like A.G. from attending school.

14.    Specifically, on June 17, 2025, Local Board Defendant and County Superintendent Serena Starcher emailed Plaintiff to advise that A.G.'s valid religious exemption certificate would not be accepted because Raleigh County Schools will "accept medical exemptions only."

15.    As a consequence of Defendants denying A.G.'s valid religious exemption from the CVL authorized by the West Virginia Department of Health, stopping her from enrolling in the Raleigh County Schools unless she takes mandatory vaccines under the CVL's schedule that violate Plaintiff's religious beliefs, and disregarding Governor Morrisey's Executive Order, the CVL and Defendants' enforcement of it violates the EPRA, substantially burdening Plaintiff's and her child's exercise of their religious beliefs to not vaccinate.

16.    Although forty-five states allow schoolchildren *both* secular and religious exemptions from compulsory vaccines, West Virginia is a radical outlier from the rest of the country in that its CVL *only* allows secular medical exemptions and disallows religious exemptions.[1]

17.    Defendants' enforcement of the CVL against Plaintiff, and defiance of Governor Morrisey's Executive Order enforcing the EPRA, are particularly troubling because the overwhelming majority of West Virginians are religious.

18.    The straightforward legal issue presented in this Complaint is whether Defendants' actions in enforcing the CVL violate the EPRA.

19.    Defendants' enforcement of the CVL against Plaintiff violates the EPRA for at least two reasons. First, it substantially burdens Plaintiff's religious beliefs to not vaccinate A.G. and is

---

[1] Forty-five states allow school-age children to be exempt from vaccinations for religious reasons and at least two others have provisions grandfathering in children with a prior religious exemption. *See* NATIONAL CONFERENCE OF STATE LEGISLATURES, *States with Religious and Philosophical Exemptions from School Immunization Requirements,* https://www.ncsl.org/health/state-non-medical-exemptions-from-school-immunization-requirements (last visited June 21, 2025).

not the least restrictive means of furthering any purported compelling State interest because it fails to provide a religious exemption option along with the secular medical exemption and other exceptions that it already allows. *See* W. Va. Code 35-1A-1(a)(1). Second, and as a separate and distinct violation of the EPRA, it treats Plaintiff's religious conduct more restrictively than conduct of reasonably comparable risk. *See* W. Va. Code 35-1A-1(a)(2).

## PARTIES

20.     Plaintiff Miranda Guzman is a widow who resides in the unincorporated community of Clear Creek, West Virginia in Raleigh County ("**Plaintiff**" or "**Ms. Guzman**"). Plaintiff maintains profound religious objections to injecting her four-year-old child, A.G., with the vaccinations required under the CVL's schedule. Defendants prohibit A.G. from attending any Raleigh County Schools unless she receives all CVL-mandated vaccines.

21.     Plaintiff obtained a religious exemption certificate from the West Virginia Department of Health exempting A.G. from the CVL's vaccination requirements for the 2025-26 school year. The West Virginia Department of Health also issued a copy of A.G.'s religious exemption certificate to Clear Fork District Elementary School, a public school within the Raleigh County Schools. *See* **Exhibit 2**.

22.     Defendant West Virginia Board of Education, pursuant to W. Va. Code §18-2-5, "[s]ubject to and in conformity with the Constitution and laws of this state," has the power to make and enforce rules in certain designated areas involving the general supervision of public schools. These areas of limited authority subject to the West Virginia Constitution and general laws of the State are carried out by and through its members Nancy White, Victor Gabriel, F. Scott Rotruck, L. Paul Hardesty, Robert W. Dunlevey, Christopher Stansbury, Deborah Sullivan, Gregory Wooten, Cathy Justice, and Superintendent Michele Blatt. All are sued in their official capacities.

23.     Defendant, Raleigh County Board of Education, pursuant to W. Va. Code §18-5-1, by and through its school board, composed of Defendants Larry Ford, Richard Snuffer, Charlotte Hutchens, Marie Hamrick, and Marsha Smith, and Superintendent Serena Starcher, are all sued in their official capacities. The Local Board Defendants pursuant to W. Va. Code §§ 18-4-10, 18-5-1, 18-5-5, and 18-5-34 have authority and control in certain areas over Raleigh County Schools.

## JURISDICTION AND VENUE

24.     Pursuant to W. Va. Code § 51-2-2, this Court has jurisdiction over this matter, because it is a matter arising in equity that seeks injunctive and declaratory relief in accordance with the EPRA, W. Va. Code § 35-1A-1(b)(1).

25.     Venue is proper in this Circuit and Raleigh County, pursuant to W. Va. Code § 14-2-2, because Plaintiff resides in this County. Venue is also proper under W. Va. Code § 56-1-1, because the Local Board Defendants reside in this County.

## FACTS

**A.      West Virginia Constitution's Take Care Clause First Enacted in 1872 Authorizes the Governor as Chief Executive to Enforce State Laws**

26.     In April of 1872, West Virginia Governor John J. Jacob by written Proclamation enshrined into law the West Virginia Constitution.[2]

27.     Embodied in the West Virginia Constitution of 1872 that still remains in effect today is W. Va. Const. art. VII, § 5 (1872), regarding the Executive Branch and the Governor's authorized State powers.[3]

---

[2] *See* https://www.wvlegislature.gov/legisdocs/publications/acts/Acts_1872_const_conv.pdf (last visited June 21, 2025).

[3] *Id.*; *see also* https://www.wvlegislature.gov/wvcode/wv_con.cfm#articleV (last visited June 21, 2025).

7

28.    It says, "The chief executive power shall be vested in the governor, who shall take care that the laws be faithfully executed." W. Va. Const. art. VII, § 5 (1872).

29.    Further, the Preamble to the State Constitution says, "Since through Divine Providence we enjoy the blessings of civil, political and religious liberty, we, the people of West Virginia, in and through the provisions of this Constitution, reaffirm our faith in and constant reliance upon God and seek diligently to promote, preserve and perpetuate good government in the state of West Virginia for the common welfare, freedom and security of ourselves and our posterity." W. Va. Const. pmbl. (1872).

30.    An expansive and broad religious freedom clause guarantee in the State Constitution also declares in relevant part that no "man [shall] be enforced, restrained, molested or burthened, in his body or goods, or otherwise suffer, on account of his religious opinions or beliefs, but all men shall be free to profess and by argument, to maintain their opinions in matters of religion." W. Va. Const. art. III, § 15 (1872).

**B.    Governor Morrisey's Executive Order Enforced the EPRA, Correcting the CVL's Glaring Defect of Not Allowing Families Religious Exemptions**

31.    As the State's Chief Executive responsible for enforcing West Virginia law, including the EPRA, Governor Morrisey's Executive Order was properly directed to public health officials requesting they implement a religious exemption process for families because the CVL, without such a process, violates the EPRA. *See* **Exhibit 1**.

32.    For example, West Virginia's scheme of allowing discretionary medical exemptions from vaccines while simultaneously adopting a de facto "no religious exemption" policy significantly undermines the State's public health goals. *See* W. Va. Code § 16-3-4 (h); *see also Bosarge v. Edney*, 669 F. Supp. 3d 598, 625 (S.D. Miss. 2023) (holding that Mississippi's

8

mandatory vaccination statutory scheme, which allowed medical exemptions while excluding religious exemptions, violated the First Amendment).

33.     And West Virginia is among the most religious states in America.[4]

34.     According to the Pew Research Center, 77% of West Virginians say that "they believe in God with absolute certainty."[5]

35.     Religious exemptions have long been the norm when it comes to school vaccination laws. Forty-five states (plus the District of Columbia) currently offer religious exemptions from their mandatory school vaccination laws.[6]

---

[4] *See* PEW RESEARCH CENTER, *How religious is you state? Available* at https://www.pewresearch.org/fact-tank/2016/02/29/how-religious-is-your-state/?state=west-virginia (last visited June 21, 2025).

[5] *See* PEW RESEARCH CENTER, *Religious Landscape Study*, *available* at https://www.pewresearch.org/religious-landscape-study/database/west-virginia/ (last visited June 21, 2025).

[6] *See* Ala. Code § 16-30-3; Alaska Admin. Code tit. 7, § 57.550; Ariz. Rev. Stat. Ann. §§ 15-872(G), -873(A)(1); Ark. Code Ann. § 6-18-702(d)(4)(A); Colo. Rev. Stat. §§ 25-4-902, -903(b)(V); Del. Code Ann. tit. 14, § 131(a)(6); D.C. Code §§ 38-501, -506(1); Fla. Stat. § 1003.22(1); Ga. Code Ann. § 20-2-771(e); Haw. Rev. Stat. §§ 302A-1154, -1156(2); Idaho Code §§ 39-4801, -4802(2); 105 Ill. Comp. Stat. § 5/27-8.1(6); Ind. Code § 21-40-6; Iowa Code § 139A.8(4)(a)(2); Kan. Stat. Ann. § 72-6262(b)((2); Ky. Rev. Stat. Ann. § 214.034(2); La. Stat. Ann. §§ 17:170(E), 40:31.16(D); Md. Code Ann., Educ. § 7-403(b)(1); Mass. Gen Laws ch. 76, § 15; Mich. Comp. Laws §§ 333.9208, .9215(2); Minn. Stat. § 121A-15; Mo. Rev. Stat. §§ 167.181(3), 210.003; Mont. Code Ann. §§ 20-5-403, -405(1)(a); Neb. Rev. Stat. §§ 79-217, 221(1); Nev. Rev. Stat. §§ 392.435, .437; N.H. Rev. Stat. Ann. § 141-C:20-a, :20-c; N.J. Stat. Ann. § 26:1A-9.1; N.M. Stat. Ann. § 24-5-1, -3(A); N.C. Gen. Stat. §§ 130A-155, -157; N.D. Cent. Code § 23-07-17.1(3); Ohio Rev. Code Ann. § 3313.671(B)(4); Okla. Stat. tit. 70, §§ 1210.191, .192; Or. Rev. Stat. § 433.267(1)(c)(A); 28 Pa. Cons. Stat. §§ 23-83, -84; 16 R.I. Gen. Laws § 16-38-2(a); S.C. Code Ann. § 44-29-180(D); S.D. Codified Laws § 13-28-7.1; Tenn. Code Ann. § 49-6-5001(b)(2); Tex. Educ. Code Ann. § 38.001(c)(1)(B); Utah Code Ann. § 53G-9-303(3); Vt. Stat. Ann. tit. 18, §§ 1121, 1122(3)(A); Va. Code Ann. §§ 22.1-271.2(C), 32.1-46(D)(1); Wash. Rev. Code § 28A.210.080, .090(1)(c); Wis. Stat. § 252.04(3); Wyo. Stat. Ann. § 21-4-309(a). Mississippi now offers a religious exemption after a federal court issued a permanent injunction following a free exercise challenge requiring Mississippi to provide a religious exemption process. *See Bosarge v. Edney*, 669 F. Supp. 3d 598, 625 (S.D. Miss. 2023).

36.     Until Governor Morrisey's Executive Order enforcing the EPRA, West Virginia was a radical outlier in prohibiting a religious exemption option from mandatory vaccines, and the *only state* in the country to have *never* offered families a religious exemption option. Only five states do not currently allow religious exemptions, and for most of them, this is a relatively recent development. California, Maine, Connecticut, and New York historically allowed religious exemptions, but those options were recently removed by the legislatures of those states.[7]

37.     Because infectious diseases spread not only in school settings and impact adults and schoolchildren alike, and most of the vaccines required to attend school under the CVL do not in any event prevent transmission, the CVL can never credibly fulfill its contagious disease mitigation goals.

38.     Even assuming all vaccines required by the CVL prevent transmission, which they do not, universal vaccination is not the only disease prevention tactic that can be deployed. States with a religious exemption process deploy a variety of alternative tactics, such as quarantine in the event of an outbreak, temporary exclusion from school, and other measures to help control disease.

39.     Moreover, West Virginia could also do what other surrounding states do in the event of a disease outbreak and keep unvaccinated children home when there is an outbreak.

---

[7] *See, e.g.*, Cal. Health & Safety Code § 120325 et seq. (religious exemption eliminated in 2016); N.Y. Pub. Health Law § 2164(1) (religious exemption removed in 2019); Conn. Gen. Stat. § 10-204a (religious exemption eliminated in 2021); Me. Stat. tit. 20-A, § 6355 (religious exemption eliminated in 2019). Notably, West Virginia is the only state that has never offered a religious exemption option. W. Va. Code § 16-3-4.

40. Notably, the states contiguous to West Virginia that allow for religious exemptions from childhood vaccination laws all implement the less restrictive alternative of quarantining, if an outbreak of an infectious disease were ever to occur.[8]

41. West Virginia's CVL also does not require any of the least restrictive countermeasures for children with medical exemptions like other states, or for unvaccinated teachers and staff working in the school system including in the Raleigh County Schools.

42. Indeed, if vaccination is effective against transmission of disease, as Defendants claim is the justification for the CVL, then a handful of religious exemptions for in-person students would present absolutely no risk to the remaining vaccinated students who attend school in person, particularly assuming as true Defendants' anticipated position that the mandated vaccines under the CVL's schedule are effective and work as intended.

43. The overwhelming majority of states have for decades recognized the compelling interest in respecting their citizens' religious freedoms and have allowed for a religious exemption

---

[8] *See, e.g.*, 28 Pa. Code § 27.77(e) (Pennsylvania: "Whenever one of the diseases … has been identified within a child care group setting, the [health] Department … may order the exclusion from the child care group setting …which is determined to be at high-risk of transmission of that disease, of an individual susceptible to that disease in accordance with public health standards …"); Kentucky Exemption Form ("In the event that the county health department or state health department declares an outbreak of a vaccine-preventable disease for which proof of immunity for a child cannot be provided, he or she may not be allowed to attend childcare or school for up to three (3) weeks, or until the risk period ends.") *available* at https://www.chfs.ky.gov/agencies/dph/dehp/imm/EPID230a.pdf; Md. Code Regs. 10.06.04.05(B) (Maryland: "The exemption allowed under … this regulation does not apply when the Secretary declares an emergency or epidemic of disease"); Oh. Rev. Code § 3313.671(C) (Ohio: "a school may deny admission to a pupil otherwise exempted from the chicken pox immunization requirement if … a chicken pox epidemic exists in the school's population. The denial of admission shall cease when the director notifies the principal … that the epidemic no longer exists"); 12 Va. Admin Code 5-110-80(A)(3) (Virginia: "Upon the identification of an outbreak, potential epidemic, or epidemic of a vaccine-preventable disease in a public or private school, the commissioner has the authority to require the exclusion from such school of all children who are not immunized against that disease.").

option from mandatory childhood vaccination requirements, further demonstrating childhood vaccination requirements are more than capable of allowing for religious exemptions without a problem.

44.    Recently, the Honorable Thomas S. Kleeh, Chief Judge of the U.S. Northern District Court of West Virginia, issued a preliminary injunction and Order in favor of a student challenging the CVL under the First Amendment's Free Exercise Clause, holding that State officials had "failed to demonstrate W. Va. Code § 16-3-4 is narrowly tailored to achieve the identified compelling state interest." *See* **Exhibit 3** at 58, a true copy of the Order is attached.

45.    But Defendants continue to stand alone on an island by enforcing the antiquated CVL that was first enacted in 1937, which glaringly has never offered a religious exemption option to families in the State like Plaintiff and her child A.G.

**C.    The CVL Has Other Numerous Defects That Undermine the State's Public Health Goals**

46.    By way of background, vaccination for some of the diseases required by the CVL have been combined into single shot, for example, the measles, mumps, and rubella ("**MMR**") vaccine.

47.    That said, most of the injections required under the CVL provide, at best, personal protection.

48.    For example, the tetanus, diphtheria, and pertussis vaccines ("**DTaP**" licensed for children up to age 6 and "**Tdap**" licensed for children 10 years of age and older) do not prevent infection or transmission of the target diseases. These vaccines potentially provide only a temporary level of personal protection by lessening the chances a recipient will experience the symptoms of these infections.

12

49.    Tetanus is not contagious from person to person. As such, the tetanus vaccine does not prevent infection and transmission of a communicable disease but rather can only provide personal protection for the recipient.[9]

50.    Likewise, the pertussis vaccine at best provides only some degree of potential personal protection for a limited duration of time.[10]

51.    The same is true of the diphtheria vaccine—it at best provides some potential degree of personal protection.[11]

52.    The meningococcal vaccine also does not contribute to herd immunity but at best provides an undefined potential personal benefit to the vaccine recipient. "Rates of meningococcal disease have declined in the United States since the 1990s and remain low today. Much of the decline occurred before the routine use of MenACWY vaccines. … [D]ata suggest MenACWY

---

[9]  *See* Centers for Disease Control and Prevention Pink Book, *available* at https://www.cdc.gov/pinkbook/hcp/table-of-contents/chapter-21-tetanus.html?CDC_AAref_Val=https://www.cdc.gov/vaccines/pubs/pinkbook/tetanus.html ( "Tetanus is not contagious from person to person.") (last visited June 23, 2025).

[10]  *See e.g.,* https://pubmed.ncbi.nlm.nih.gov/31333640/ ( "Natural infection evokes both mucosal and systemic immune responses, while aPVs [acellular pertussis vaccine, the exclusive pertussis vaccine used in the United States] induce only a systemic immune response. … Mucosal immunity is essential to prevent colonization and transmission of B. pertussis organisms. Consequently, preventive measures such as aPVs that do not induce a valid mucosal response **can prevent disease but cannot avoid infection and transmission. … aPV pertussis vaccines do not prevent colonization. As such, they do not reduce the circulation of B. pertussis and do not exert any herd immunity effect.**") (emphasis added) (last visited June 21, 2025).

[11]  *See e.g.,* https://pubmed.ncbi.nlm.nih.gov/5026197/ (Diphtheria vaccine only creates antibodies to a toxin released by the diphtheria bacteria and does not generate any antibodies to the diphtheria bacteria itself, hence **"Diphtheria toxoid helps prevent symptomatic disease but does not prevent the carrier state nor stop the spread of infection."**) (emphasis added) (last visited June 21, 2025).

vaccines **have provided protection to those vaccinated, but probably not to the larger, unvaccinated community (population or herd immunity)**."[12]

53.    Contrary to the common conceptions, the currently mandated polio vaccine (and the only one available in the United States) also does not prevent infection and transmission of the targeted pathogen. It too is a personal protection vaccine at best. That is because the "inactivated polio vaccine (IPV) is the only polio vaccine that has been given in the United States since 2000." "IPV… protects people from polio disease but does not stop transmission of the virus."[13]

54.    Like COVID-19 vaccines, these vaccines in the CVL's schedule do not result in "herd immunity." And West Virginia does not require COVID-19 vaccines as a condition of entering school. *See* W.Va. Code §§ 16-3-4b, 16-3-4c.

55.    Since these products potentially reduce symptoms, but do not prevent infection and transmission, those vaccinated with these products are more likely to asymptomatically spread these pathogens due to a false sense of security and misunderstanding of the limitations of these products.

56.    Further, hepatitis B is not transmitted through activities in a school setting, as confirmed by federal health authorities. In response to a FOIA request, the CDC stated, "A search of our [CDC] records failed to reveal any documents" of "transmission of Hepatitis B in an

---

[12] *See* CDC, Meningococcal Vaccination: *What Everyone Should Know*, *available* at https://www.cdc.gov/vaccines/vpd/mening/public/index.html (emphasis added) (last visited June 21, 2025).

[13] *See* CDC webpage, *Polio Disease and Poliovirus Containment*, *available* at https://www.cdc.gov/orr/poliaviruscontainment/diseaseandvirus.htm, which links to the CDC et al., *Polio Global Eradication Initiative* webpage, *available* at https://polioeradication.org/about-polio/the-vaccines/ipv/, which further explains: "IPV induces very low levels of immunity in the intestine. As a result, when a person immunized with IPV is infected with wild poliovirus, the virus can still multiply inside the intestines and be shed in the feces … **IPV does not stop transmission of the virus**." (emphases added) (last visited June 21, 2025).

14

elementary, middle or high school setting." *See* CDC FOIA Response Regarding Hep B Vaccine, a true and correct copy attached hereto as **Exhibit 4**.

57.    Thus, four of the six injections required under the CVL are incapable of preventing infection and transmission of target pathogens in the school setting and are, at best, personal protection vaccines.[14]

58.    The only remaining vaccines required under the CVL are the MMR and varicella injections.

59.    Unlike those who have been previously infected with a target pathogen (nearly 100% of whom become immune), many of the students who have received all required doses pursuant to the CVL will not seroconvert and hence are akin to children who did not receive these products.

60.    For example, numerous studies estimate anywhere from 2 to 10% of those vaccinated with two doses of measles vaccine fail to develop protective humoral immunity and for those who do develop some level of protective immunity, studies find that those antibody levels wane over time.[15] After two doses of rubella vaccine, an estimated 9% of children do not seroconvert.[16] The efficacy for the mumps vaccine has been shown to be far worse than that of both measles and rubella. Hence, these children who do not seroconvert or whose immunity has waned are no different than a child who never received these products.

---

[14] Ten vaccines are required under the CVL, *see* W. Va Code § 16-3-4 (c) and (e), but because they are injected in combination vaccines, a total of six distinct products with multiple doses for several of the vaccines (e.g., MMR, DTaP, varicella, etc.) are required.

[15] *See, e.g.*, https://pubmed.ncbi.nlm.nih.gov/23256739/; https://pubmed.ncbi.nlm.nih.gov/17339511/.

[16] *See* https://pmc.ncbi.nlm.nih.gov/articles/PMC5576672/; https://pubmed.ncbi.nlm.nih.gov/25891446/; https://pubmed.ncbi.nlm.nih.gov/34556367/; https://pubmed.ncbi.nlm.nih.gov/27895276/.

61.    The same is true for the varicella vaccine (i.e., the chickenpox).

62.    The CVL does not require children to be tested to see if they show immunity to these pathogens before they are enrolled at school despite the fact that these products do not provide even measurable protection to a percent of children directly after injection (and this is putting aside the fact that efficacy wants over time which occurs for all of these products).

63.    In addition, the varicella vaccine is a live virus vaccine, meaning there is, albeit modified, live chicken pox virus in each dose. Those vaccinated with this live virus can infect others with the chicken pox virus for up to six weeks after receipt of the live vaccine. This is why its package insert, approved by the FDA, explains "that transmission of varicella vaccine virus (Oka/Merck) resulting in varicella infection including disseminated disease may occur between vaccine recipients (who develop or do not develop a varicella-like rash) and contacts susceptible to varicella including healthy as well as high-risk individuals" and that "[d]ue to concern for transmission of vaccine virus, vaccine recipients should attempt to avoid whenever possible close association with susceptible high-risk individuals for up to six weeks following vaccination" including "[i]mmunocomposed individuals [and] [p]regnant women … [and] [n]ewborn infants of mothers without documented history of varicella."[17]

64.    Nevertheless, even in light of these scientific findings from the FDA, the CVL does not exclude those vaccinated with this product from West Virigina schools for six weeks after vaccination to prevent transmission.

65.    In practice, West Virginia officials and Defendants do not strictly follow the CVL and liberally allow unvaccinated children to remain in school.

---

[17] *See* https://www.fda.gov/media/76008/download?attachment (last visited June 21, 2025).

16

66.     Indeed, the State Board Defendants and Local Board Defendants allow numerous children who do not have all required vaccinations to remain enrolled in school and to attend in-person classes, provided they do not request a religious exemption from the CVL before enrolling.

67.     For example, in response to requests under the West Virginia Freedom of Information Act, W. Va Code § 29B-1-1, et seq., ("**WVFOIA**"), Local Board Defendant Superintendent Starcher on behalf of Raleigh County Schools responded and confirmed on May 24, 2024, that, in the 2023-24 school year, sixteen children who did not have all required vaccinations were enrolled in in-person classes for more than thirty days (one medical exemption and fifteen students with no exemptions). No student received a religious exemption from Raleigh County Schools during this period. Attached as **Exhibit 5** is a true and correct copy of the Raleigh WVFOIA response.

68.     Similarly, the Fayette County Board of Education responded that, in the 2023-24 school year, 440 children who did not have all required vaccinations were enrolled in in-person classes for more than thirty days. Attached as **Exhibit 6** is a true and correct copy of the Fayette WVFOIA response.

69.     And the Monongalia County School District reported 147 children who did not have all required vaccinations but who were enrolled in in-person classes for more than thirty days. Attached as **Exhibit 7** is a true and correct copy of the Monongalia WVFOIA response.

70.     These are just three examples of school districts which permit unvaccinated students to attend in-person classes. Many more students who are out of compliance with the CVL are permitted to attend in-person classes in school districts throughout the State, so long as they do not request a religious exemption.

71.     Official federal government records also indicate considerable non-compliance rates for West Virginia kindergarteners attending in-person classes. For example, according to CDC records for the 2022-23 school year, as many as 4.4% of West Virginia kindergarteners fail to comply with the CVL.[18]

72.     These involve instances of school districts and children that are willfully out of compliance with the CVL, yet the students are permitted to continue their educations in-person, while Defendants prevent Plaintiff from sending A.G. to school with a religious exemption.

73.     West Virginia's lackadaisical approach to its vaccination requirements in school settings is further demonstrated by the fact that teachers and others working in West Virginia's educational system are not subject to the vaccination requirements of the CVL. Many, if not most, teachers, administrators, and staff working in the West Virginia school system have never been required to receive the full battery of injections required by the CVL's vaccine schedule.

74.     This is because, as of 1986, when many of the adults in the school system were themselves in school, there were only three routine vaccines in the U.S. It was only after 1986, the year Congress gave pharmaceutical companies immunity from liability for injuries caused by childhood vaccines, that the explosion in the childhood vaccine schedule occurred. *See* 42 U.S.C. §§ 300aa-11. And in the years following this immunity from liability protection, West Virginia then required the recombinant Hep-b vaccine, the varicella vaccine, the pertussis vaccine, and the conjugate meningococcal vaccine for school.

---

[18] *See* CENTERS FOR DISEASE CONTROL, *Vaccination Coverage and Selected Vaccines and Exemption Rates Among Children in Kindergarten – United States*, 2022-23 School Year, available at https://www.cdc.gov/mmwr/volumes/72/wr/mm7245a2.htm#:~:text=National%20 coverage%20remained%20near%2093,22%20school%20year%20(2.6%25) (detailing percentages of religious and medical exemption rates, along with non-compliance rates, for U.S. kindergarteners in the 2022-23 school year, and detailing a non-compliance rate in West Virginia of approximately 4.4%) (last visited June 21, 2025)).

75.     Most adults in the State today, who comprise over 80% of the State's population,[19] were never subject to most of the State's school vaccine requirements.

76.     The State has shown through action and inaction that its infectious disease related goals can be accomplished while allowing exceptions to the CVL.

77.     Defendants liberally allow for non-vaccination for secular reasons throughout the State, including in school settings.

78.     The State permits teachers and staff who are not fully up to date with the required vaccines to roam freely throughout campuses across the state and intermingle with schoolchildren without showing proof of vaccination.

79.     Defendants also permit the public, including countless numbers of West Virginia citizens who remain unvaccinated or partially unvaccinated for any reason they choose, including secular reasons, to freely access school campuses throughout the state without vaccination-based entry restrictions including at events in which there are large crowds gathered in close proximity, such as high school and college basketball and football games.

80.     These examples demonstrate the CVL's numerous defects that undermine the State's purported public health goals, including that Defendants allow several secular exemptions from mandatory vaccination.

---

[19] *See* UNITED STATES CENSUS BUREAU, *QuickFacts, West Virginia*, available at https://www.census.gov/quickfacts/fact/table/WV,US/PST045223 (last visited June 21, 2025).

**D.     The State Board Defendants and Local Board Defendants Take Action Against Plaintiff to Regulate Vaccines and Exemptions in Schools Under the CVL**

81.     Just over a week ago, the State Board Defendants voted to disregard Governor Morrisey's Executive Order that provided a religious exemption option from the CVL.

82.     After the vote, the State Board Defendants released a public statement and said, "The WVBE directed the State Superintendent of Schools to notify all school districts to follow the law that has been in effect since 1937 [the CVL]. This is in line with the Action of the West Virginia Legislature during the 2025 Regular Session, which did not vote in favor of religious exemptions for vaccines."[20]

83.     Notably, in their public statement the State Board Defendants did not say specifically what provision of the CVL, W. Va. Code § 16-3-4, they were relying on to regulate exemptions from the CVL and thus disregard the Governor's Executive Order.

84.     Nevertheless, the Local Board Defendants followed the State Board Defendants' directive and are not honoring Plaintiff's religious exemption certificate for A.G. that she received from the State Public Health Officer.

85.     On June 17, 2025, Plaintiff Ms. Guzman emailed the Raleigh County Schools to inquire about enrolling A.G. for the upcoming 2025-26 school year and said:

> She has been accepted at CFDE For the upcoming school year 25–26 in preschool with a religious exemption. I am super excited about [] going to school, but I have been very confused and concerned with the latest news that I have heard from the state Board of Education and I want to know if Raleigh County will be accepting the religious exemption or not.

---

[20]     *See*     https://www.wtrf.com/news/west-virginia-board-of-education-votes-to-continue-mandatory-vaccines-for-schools/ (last visited June 21, 2025).

86.     That same day, Local Board Defendant Superintendent Starcher responded to Plaintiff's email and said:

> Ms. Guzman,
>
> Thank you for your email.  Raleigh County Schools will follow direction provided by the West Virginia Board of Education at its most recent meeting. As such, Raleigh County Schools will follow the law and accept medical exemptions only.
>
> Thank you.
>
> Serena Starcher
> Superintendent

87.     Thus, at the direction of the State Board Defendants, Local Board Defendants have taken official government action and have excluded Plaintiff's child A.G. from enrolling in Clear Fork District Elementary School by not honoring her religious exemption certificate issued by the State Department of Health because they only accept medical exemptions from the CVL.

88.     The Local Board Defendants have also issued to all Raleigh County School principals a written directive effective immediately to disregard any previous communication regarding vaccination requirements under the CVL, and that only medical exemptions are permitted. Attached as **Exhibit 8** is a true and correct copy of this written directive.

89.     Defendants have taken the position that they are the exclusive government enforcers of the CVL, including regulating secular and religious exemptions.

**E.     The CVL Substantially Burdens Plaintiff's Religious Beliefs**

90.     Plaintiff has sincere religious beliefs against vaccinating her child A.G., beliefs which are substantially burdened by the CVL and Defendants' enforcement of the CVL.

91.     For religious reasons, A.G. has never received any of the mandated vaccines on the CVL's schedule.

21

92.    Plaintiff is a Christian and has been for decades.

93.    Plaintiff possesses multiple religious objections to vaccinating A.G., based on her Christian beliefs, including the following four examples.

94.    *First*, Ms. Guzman maintains profound religious objections to the vaccines' use of aborted fetal cells. As a Christian, Plaintiff has maintained objections to abortion going back to at least her teenage years in the 1990s. Her religious objections further solidified when she was working as a neo-natal ICU nurse in the early 2000s. In the 2008 timeframe, Plaintiff treated a newborn child who had serious medical conditions, rendering the newborn incompatible with life. The family was advised that child would likely not make it through delivery, and would not live if delivered and were therefore advised of the benefits of terminating the child's life pre-birth. The family, however, decided to keep the child because of their religious beliefs against abortion. The child was born alive, and Ms. Guzman observed as the family spent precious time with the baby girl, which would not have occurred had they listened to the medical advice to terminate the pregnancy. This profound experience, and others like it, cemented Ms. Guzman's religious objections to the practice of abortion.

95.    Plaintiff learned that vaccines required under the CVL were designed and developed through use of aborted children's body parts. As a Christian who sincerely believes that the Bible prohibits abortion, Plaintiff views this prohibition to include declining any injection of a substance into her child that was made from the use of aborted children. She sincerely believes that the taking of an unborn life is tantamount to murder, and to be connected to that sin through vaccinating A.G. with vaccines, including but not limited to those that contain aborted fetal tissue from children whose lives were ended to advance medical research, would entail profound and potentially eternal consequences.

22

96.    Religious objections, like Plaintiff's, to vaccination based on fetal cell involvement in the development and production of vaccines on the CVL's childhood schedule are not attenuated or foundationless religious objections. Abortion and fetal cell research in the development of childhood vaccines is well-documented.

97.    For example, in just one study, over seventy-five normally developing babies were aborted, and while keeping the fetuses alive for harvesting their body parts, had nearly every body part chopped up into little cubes to culture viruses on, including their tongues, livers, intestines, pituitary glands, kidneys, and hearts. *See* attached as **Exhibit 9** from the Wistar Institute of Anatomy and Biology, Cytological Virological and Chromosomal Studies of Cell Strains from Aborted Human Fetuses (May 1966) (detailing aborted pre-born and normally developing children in support of vaccination research and development).

98.    In sworn testimony, Dr. Stanley Plotkin—who is commonly referred to as the "Godfather" of vaccines, and one of the lead researchers on the aforementioned study—candidly admitted he worked with the chopped-up pituitary glands, kidneys, spleens, and hearts of seventy-six healthy, normally developing babies, whose tissue needed to remain alive to be used to culture viruses, whose mutilated bodies were utilized in furtherance of his research. *See* attached as **Exhibit 10** a true and correct copy of excerpts of the Deposition of Stanley Plotkin, Jan. 11, 2018, at pdf pp. 9-12 of 17.[21]

99.    Additionally, many of the CVL-required vaccines contain genetic and cellular material derived from aborted fetuses, materials that would be injected directly into A.G.'s body were Plaintiff to comply with West Virginia's mandatory vaccination requirements. *See, e.g.*, FDA

---

[21] *See also* excerpt of deposition video of Dr. Stanley Plotkin discussing this study, available at https://www.sirillp.com/plotkin-abortion/ (last visited July 5, 2024).

Package Insert for M-M-R II Vaccine, attached hereto as **Exhibit 11**, at pdf p. 8 of 12 (stating the Measles, Mumps, and Rubella ("MMR") combination vaccine contains strains of "human diploid lung fibroblasts" cultured from a fetal cell line); *see also* FDA Package Insert for VARIVAX vaccine, attached hereto as **Exhibit 12**, at pdf pp. 9-10 of 16 (stating the Varicella vaccine was propagated in "human diploid cell cultures" and "contains residual components of [a fetal cell line] including DNA and protein").

100.    To vaccinate A.G. would force Plaintiff into participating in an action with illicit connections to the termination of an innocent life, and into activity that condones abortion.

101.    After learning that many vaccines have been researched, tested, and developed through the use of aborted fetal cell lines, and that several vaccines required under the CVL contain human genetic material derived from aborted pre-born children, Plaintiff has never vaccinated A.G. Plaintiff cannot in good conscience knowingly inject A.G. with anything that would make her complicit in the sin of abortion.

102.    ***Second***, Plaintiff also possesses religious objections to vaccination based on the belief that she must not preemptively tinker with A.G.'s God-given natural immune system. Plaintiff takes a natural approach to treating illness, believing that God has created humans with well-functioning immune systems that were designed by God to counteract threats. While Plaintiff does not object to all medication in general, she only seeks out medication when an intervention is clearly necessary.

103.    This is because Plaintiff sincerely believes that God designed her child's immune system with special care and with the well-designed ability to counteract disease (even though it is not fail-proof), and that to preemptively alter that immune system would demonstrate a lack of faith in God. Accordingly, because of these beliefs, Plaintiff does not seek medical attention unless

24

she or A.G. are sick, and additionally, only in cases where, after focused prayer, she is certain their God-given immune systems are incapable of eliminating that sickness without assistance. To do otherwise would be to violate her religious beliefs and faith in God.

104.    *Third*, Plaintiff believes that one's physical body is the temple of God's Holy Spirit because the scriptures state that one's body is God's temple. As such, Plaintiff is careful to observe the Bible's instruction to guard one's physical body. Consequently, Plaintiff does not have tattoos and does not consume alcohol because she believes she must keep her body spiritually clean. In Plaintiff's system of beliefs, she believes the vaccines required under the CVL are spiritually impure and that to inject them into A.G. would defile the temple of God's Holy Spirit.

105.    *Fourth*, Plaintiff has engaged in thoughtful prayer regarding whether to vaccinate A.G. and has come under firm spiritual conviction that she must not; she is confident that conviction came from the Holy Spirit. Through her spiritual journey, Plaintiff has learned the importance of seeking God's direction for both large and small decisions. For example, in 2013 Plaintiff and her husband were living in Virgina, in her dream home. Her husband passed away, and it made the most practical sense to stay in Virginia to raise her children in the already established home. However, after engaging in focused prayer regarding what to do next, Plaintiff knows she received firm direction from the Holy Spirit to move to West Virginia to be closer to family to raise her children.

106.    When Plaintiff is under conviction from the Holy Spirit, she is careful to obey, knowing that to do otherwise will entail eternal consequences.

107.    Plaintiff sought guidance from the Holy Spirit through prayer, and gained what she is certain is firm direction from the Holy Spirit that she must not vaccinate A.G.

108.    After much thought and prayer, Plaintiff is certain that vaccinating A.G. would be to disobey the Holy Spirit's leading.

109.    Plaintiff's religious objections to vaccination detailed above have been substantially burdened by Defendants through their directives, including as they relate to the CVL and excluding A.G. from attending the Raleigh County Schools.

110.    Because A.G. is unvaccinated, and lacks secular reasons for being unvaccinated, she is not permitted by Defendants to enroll in Clear Fork District Elementary School.

111.    If Plaintiff's child faced medical repercussions from vaccinating, they could seek an exemption pursuant to the CVL but the fact that they seek spiritual and religious repercussions is meaningless under the CVL.

112.    Plaintiff is a widow, and she is the sole provider for her family. Plaintiff has been receiving survivor benefits since her husband's death in 2013, and these benefits will terminate in 2027.

113.    Plaintiff is a registered nurse and will soon need to re-enter the workforce to provide for her family, which she will be unable to do because she has to keep A.G. at home because of the CVL and Defendants' enforcement of the CVL against her, including not honoring A.G.'s valid religious exemption, in defiance of Governor Morrisey's Executive Order and in violation of the EPRA.

114.    Defendants have made it virtually impossible in Plaintiff's specific case to educate her child, provide for her family, and simultaneously uphold her religious convictions.

115.    Plaintiff has been severely burdened and negatively impacted on multiple fronts by the decision to exercise her sincerely held religious beliefs in conflict with the CVL's mandatory vaccination requirements.

116.    A.G. has been categorically excluded from West Virginia's educational system, including the irrational and punitive decision by the State Board Defendants and Local Board Defendants to exclude A.G. from the Raleigh County Schools.

117.    Notwithstanding the CVL and Defendants' prohibition on her attending Clear Fork District Elementary School, A.G. regularly socializes with other children her age.

118.    For example, A.G. frequently has playdates with cousins, who also live in Clear Creek, and with friends, and A.G. plays with and learns alongside children at Sunday school. A.G. interacts with West Virginia children outside of a school setting on a daily basis.

119.    A.G. has playdates with friends and cousins, who attend public school at Fairdale. A.G. has participated in organized gymnastics and competition cheer, both of which entail hours' long sessions with large numbers of children A.G.'s age. A.G. has signed up for a dance camp in July and will be interacting with large numbers of children A.G.'s age.

120.    August 26, 2025, is the first day for student instruction in the 2025-26 school year for Raleigh County Schools.[22]

121.    Therefore, Plaintiff needs and therefore respectfully requests relief from this Court at least thirty days before that date or on or before **July 25, 2025**, to properly enroll A.G. in school.

---

[22] *See* https://boe.rale.k12.wv.us/article/2149605 (last visited June 20, 2025).

## COUNT I
## (VIOLATION OF EQUAL PROTECTION FOR RELIGION ACT
## W. Va. Code § 35-1A-1)

**The CVL Substantially Burdens Plaintiff's Religious Beliefs to Not Vaccinate A.G. and Is Not the Least Restrictive Means of Furthering a Compelling State Interest**

122.     Plaintiff incorporates the allegations in the foregoing paragraphs as if set forth fully herein.

123.     The EPRA, W. Va. Code § 35-1A-1, provides in relevant part: "(a) Notwithstanding any other provision of law, no state action may: (1) Substantially burden a person's exercise of religion unless applying the burden to that person's exercise of religion in a particular situation is essential to further a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest; nor (2) Treat religious conduct more restrictively than any conduct of reasonably comparable risk; nor (3) Treat religious conduct more restrictively than comparable conduct because of alleged economic need or benefit."

124.     It also provides that "(b) (1) A person whose exercise of religion has been substantially burdened, or is likely to be substantially burdened, in violation of this article may assert such violation or impending violation, including against the state or its political subdivisions, as a claim or as a defense in any judicial or administrative proceeding: Provided, That relief is limited to injunctive or declaratory relief and reimbursement of costs and reasonable attorney fees."

125.     Defendants' State actions enforcing the CVL against Plaintiff, including refusing to recognize religious exemptions from the CVL while simultaneously recognizing medical exemptions and allowing other exceptions and non-compliance, refusing to honor A.G.'s valid religious exemption from the State Health Department, and not following Governor Morrisey's Executive Order 7-25, also substantially burden Plaintiff's exercise of her religion to not vaccinate

28

A.G., and do so in a manner that is not essential to further a compelling State interest and is not the least restrictive means of furthering any alleged compelling State interest, which violate W. Va. Code § 35-1A-1(a)(1).

126.    Defendants' State actions enforcing the CVL against Plaintiff, including refusing to recognize religious exemptions from the CVL, refusing to honor A.G.'s valid religious exemption from the State Health Department, and not following Governor Morrisey's Executive Order 7-25, treat Plaintiff's religious conduct to not vaccinate A.G. more restrictively than any conduct of reasonably comparable risk, such as the State allowing other students medical exemptions and other exceptions including non-compliance from the CVL, which violate W. Va. Code § 35-1A-1(a)(2).

127.    Courts are instructed to not inquire into the validity or plausibility of a person's beliefs; instead, the task is to determine whether "the beliefs professed [] are sincerely held and whether they are, in [a believer's] own scheme of things, religious." *United States v. Seeger*, 380 U.S. 163, 185 (1965). The "guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715-16 (1981).

128.    Plaintiff's sincerely held religious beliefs that prohibit her from vaccinating her minor child, A.G., have been substantially burdened by Defendants. Plaintiff's attempts to enroll A.G. in the Raleigh County Schools with a religious exemption from the CVL were rejected.

129.    As such, Defendants have pitted Plaintiff's religious integrity against educating A.G. even though West Virginia has created a system of public education whereby it guarantees an education to every student. *See, e.g., Pauley*, 162 W. Va. at 707 (holding that "[t]he mandatory requirements of 'a thorough and efficient system of free schools' found in . . . the West Virginia

29

Constitution, make education a fundamental, constitutional right in this State."); *see also State v. Beaver*, No. 22-616, at \*36 ("Both the State Constitution and [West Virginia courts] have established that education is a fundamental right").

130.    Nevertheless, despite West Virginia's guarantee of a free public-school education, Plaintiff's child, A.G., cannot obtain a formal education because of her mother's religious convictions, not in public school, private school, or even in a virtual academy.

131.    But West Virginia families with secular, medical motivations for declining compulsory vaccination can be exempted from the CVL's mandatory requirements. Those exempt children, unlike Plaintiff's child, A.G., are then free to attend class in person while unvaccinated.

132.    Defendants have made a value judgment that secular (i.e., medical) motivations for opting out of compulsory vaccination under the CVL are permitted, but that religious motivations are not. In other words, under the CVL's scheme that Defendants are enforcing against Plaintiff, medical motivations are superior to religious motivations. That alone violates the EPRA.

133.    Whatever interest Defendants may have in promoting childhood vaccination in schools, their interest is not so extraordinary or compelling as to allow an exemption from the CVL for secular reasons, while simultaneously forbidding an exemption for religious reasons.

134.    Further, Defendants liberally allow functional exemptions through non-enforcement of the CVL as the WVFOIA examples and exhibits clearly show, and do not prohibit unvaccinated children from visiting public libraries or museums, or from interacting with their peers in any other way. Nor do Defendants require that teachers, staff members, or school visitors provide proof of vaccination upon entry into a particular school. Defendants also allow unvaccinated students to be educated in learning pods in unlimited numbers.

135.     These activities in which West Virginia permits non-vaccination for secular reasons each, in isolation, pose a purported greater threat to its purported infectious disease-related goals than would permitting A.G. to be educated with a religious exemption from the CVL.

136.     It is axiomatic that a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that purportedly vital interest unprohibited (e.g., here, granting medical exemptions for students physically attending school, permitting functional exemptions through lax enforcement of the CVL, and by allowing unvaccinated adults to work in the educational system).

137.     And Defendants cannot rely on a broad policy goal in defending the CVL but must demonstrate a compelling State interest in denying a religious exemption to Plaintiff specifically. Defendants must further show that specifically denying Plaintiff a religious exemption in her particular situation is the least restrictive means of furthering a compelling State interest.

138.     Defendants cannot meet these stringent requirements.

139.     For the reasons detailed throughout, the CVL is not essential to achieving a compelling State interest in Plaintiff's particular situation, is not the least restrictive means of furthering a compelling interest, is not narrowly tailored, is overinclusive and substantially underinclusive, and therefore fails to adhere to the EPRA on these additional grounds.

140.     West Virginia's CVL cannot withstand heightened scrutiny because it is both over-inclusive and underinclusive relative to the State interests it purportedly attempts to achieve. Instead of regulating with the precision and refinement necessary to avoid conflict with burdening its citizens' free exercise rights, West Virginia has taken the extraordinary position of eliminating *every* possibility for its citizens' religious observance in the mandatory vaccination arena.

141.    West Virginia's compulsory vaccination scheme is underinclusive because it only applies to children in a school setting. The vaccine mandate does not apply to non-school attending children (who regularly interact with their peers) nor to adults in the State, who comprise over 80% of West Virginia's population.

142.    The CVL is also underinclusive because children possessing a religious exemption in schools would pose no greater threat than their secular peers with a medical exemption. Moreover, the vaccination requirements do not apply to adults who are employed in West Virginia's school system, or to school visitors.

143.    Further, the existence of a religious exemption for attending school would have an immaterial impact on the number of individuals vaccinated in West Virginia. Nor would the existence of a religious exemption option from the CVL materially impact the overall percentage of vaccinated school children.

144.    Given that West Virginia boasts one of the highest vaccination rates in the country, allowing a religious exemption for a handful of students like A.G., just as secular medical exemptions are permitted, would constitute an actual attempt at narrow tailoring and provide the least restrictive means to achieving a compelling State interest. These children already live in West Virgina and regularly interact with the communities in which they live in, they are just not permitted to attend school.

145.    Because West Virginia's CVL is simultaneously too narrow and too broad to fulfill the State interests it purportedly attempts to accomplish and considering that forty-five other states have religious exemption options, the regulation lacks the narrow tailoring necessary to survive the heightened review that is required under EPRA.

146.    Collectively, the aggregation of individual secular behaviors the State permits—medical exemptions, students who are permitted to attend school on a daily basis while willfully out of compliance with the CVL, teachers and staff who are not subject to the law, the learning pod option for unvaccinated children, and members of the general public who have not received vaccines required under the law but who regularly intermingle on school campuses and mass gatherings throughout the state——pose a dramatically greater impingement to West Virginia's stated goals than would permitting Plaintiff's child A.G. to attend school with a religious exemption. Again, Plaintiff's child is already part of the community in every possible manner; A.G. is just not permitted to attend school.

147.    Further, this aggregation of individual behaviors that Defendants permit poses a significantly greater impingement to Defendants' purported goals than would permitting a religious exemption option for A.G. to be exempt from the CVL.

148.    Childhood vaccination schemes, including in West Virginia, are clearly amenable to exemptions. That cannot be reasonably undisputed.

149.    West Virginia's CVL violates the EPRA because it is not essential to further a sufficiently "compelling" State interest for purposes of EPRA's exacting standards in Plaintiff's particular situation, nor is it the least restrictive means of furthering any compelling State interest Defendants allege because it does not offer Plaintiff a religious exemption option for A.G. to attend school in Raleigh County.

150.    Here, the option for a religious exemption mechanism can be seamlessly implemented, like it has been in forty-five other states and how medical exemptions have been implemented in West Virginia, without endangering ordered State governance and preservation of the CVL.

33

151.    These states have demonstrated that their goals undergirding vaccination requirements can be satisfied while simultaneously respecting families' religious freedoms.

152.    The CVL is also overbroad because it captures more conduct than necessary to achieve its goals.

153.    First, the CVL fails to include a reasonable religious exemption option for the miniscule fraction of families who, like Plaintiff, hold sincere religious beliefs against vaccinating their children. Thus, their religion is substantially burdened by the CVL, and there is no less restrictive alternative that would not force them to violate their religious beliefs available for them to educate their children.

154.    Second, assuming the required vaccines provide the protection that Defendants claim and considering that the overwhelming majority of West Virginia families have vaccinated their children in compliance with the CVL, Defendants do not meaningfully advance their goals in the least restrictive manner by forcing Plaintiff to violate her sincerely held religious beliefs by injecting A.G. with the required vaccines as a condition of education in the Raleigh County Schools. Stated another way, while the State may have a compelling interest in the abstract, that does not mean that it has one "in each marginal percentage point by which" it achieves its general goals. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 803 n.9 (2011).

155.    West Virginia's CVL also violates the EPRA because it permits, from a risk perspective, "comparable" secular activity that fatally undermines the State's purported infectious disease related goals.

156.    *First*, West Virginia has granted medical exemptions from the CVL, and these medical exemptions are for children who attend school in-person. Unvaccinated schoolchildren with a medical exemption are permitted to attend school and intermingle and socialize with other

34

children on a daily basis. A single child with a medical exemption who attends in-person instruction in the Raleigh County Schools and elsewhere in the State presents the same hypothetical purported risk that a child, like A.G., with a religious exemption does, accepting that all of Defendants' claims about these products are true.

157.    *Second*, West Virginia permits scores of unvaccinated children to continue their education, despite non-compliance with the CVL, and these children intermingle and socialize in person with their peers on a daily basis. These children have not presented a medical or religious reason for non-compliance with the CVL as the various WVFOIA exhibits show. A single child out of compliance with the law permitted to continue attending school presents the same purported threat to West Virginia's public health goals as would permitting A.G. to attend school with a religious exemption, accepting that all of Defendants' claims about these products are true.

158.    *Third*, West Virginia permits adults working in the school system—teachers, administrators, lunch staff, bus drivers, etc.—to altogether disregard the CVL's vaccination requirements. Most adults working in the system have never been required to receive the full schedule of vaccines required under the CVL. A single adult working in person in the school system who has not received the vaccines required by the CVL presents the same purported threat to West Virginia's public health goals than permitting A.G. to attend school with a religious exemption, accepting that all of Defendants' claims about these products are true.

159.    *Fourth*, West Virginia does not place restrictions on unvaccinated children or adults outside of the school setting, or outside of school hours. For example, under Defendants' logic, one unvaccinated child or adult attending a crowded University of West Virginia Mountaineers' basketball game at WVU Coliseum presents less of a threat to West Virginia's public health goals

than permitting unvaccinated children with a religious exemption, like A.G., to pursue their education in the Raleigh County Schools.

160.    *Fifth*, even if the State's infectious disease related goals could logically be restricted to children, and exclusively in a school setting during school hours, West Virginia permits unvaccinated children to be educated in unlimited numbers in "learning pods," a school setting where children intermingle on a daily basis. Under W. Va. Code § 18-8-1, the government permits unvaccinated children—whatever their reasons for declining vaccination—to be educated in these learning pods. This too presents a considerably greater threat to West Virginia's claimed public health goals than permitting A.G. to attend school with a religious exemption.

## INJUNCTIVE RELIEF ALLEGATIONS

161.    Plaintiff incorporates the allegations in the foregoing paragraphs as if set forth fully herein.

162.    Plaintiff alleges that, as applied, the CVL violates and substantially burdens her religious liberties and rights under the EPRA to not vaccinate A.G. as a condition of enrolling A.G. as a student in the Raleigh County Schools.

163.    Plaintiff is being and will continue to be irreparably harmed unless this Court enjoins Defendants from enforcing the CVL against Plaintiff.

164.    Plaintiff has no plain, speedy, and adequate remedy at law to prevent Defendants from enforcing the CVL against Plaintiff.

165.    If not enjoined by this Court, Defendants will continue to implement and enforce the CVL in violation of Plaintiff's rights under the EPRA.

166.    Accordingly, injunctive relief is appropriate.

36

## DECLARATORY RELIEF ALLEGATIONS

167.    Plaintiff incorporates the allegations in the foregoing paragraphs as if set forth fully herein.

168.    Plaintiff is entitled to a declaratory judgment pursuant to W.Va. Code §55-13-1. An actual and substantial controversy exists between Plaintiff and Defendants as to their legal rights and duties with respect to whether West Virginia's CVL, which allows for secular but not religious exemptions, violates the EPRA.

169.    The case is presently justiciable because the CVL and absence of any religious exemption to it applies to Plaintiff, who is currently harmed by having her child, A.G., excluded from the Raleigh County Schools.

170.    Declaratory relief is therefore appropriate to resolve this controversy.

## NO NOTICE REQUIRED UNDER W. VA. CODE § 55-17-3

171.    Plaintiff incorporates the allegations in the foregoing paragraphs as if set forth fully herein.

172.    Notice is not required under W. Va. Code § 55-17-3 because Plaintiff has been, and continues to be, irreparably harmed by Defendants' enforcement of the CVL against Plaintiff and A.G.

173.    Generally, under W. Va. Code § 55-17-3, at least thirty days prior to the institution of an action against a governmental agency, the complaining party or parties shall provide the chief officer of the governmental agency and the Attorney General written notice of the action. This requirement, however, "do[es] not apply in actions seeking injunctive relief where the court finds that irreparable harm would have occurred if the institution of the action was delayed by the provisions of this subsection." W. Va. Code § 55-17-3 (a)(1).

37

174.    If the First Amendment and the federal Religious Freedom Restoration Act ("**RFRA**"), 42 U.S.C. § 2000bb, provide any guidance, violation of Plaintiff's religious freedom under the EPRA constitutes irreparable injury as a matter of law. *See Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *see also Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) (concluding the First Amendment's irreparable harm analysis would extend to RFRA, a law that the people's representatives passed to protect against the violation of free-exercise rights); *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) ("[C]ourts have held that a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA.").

175.    Plaintiff is suffering and will continue to suffer additional irreparable harm absent prompt injunctive relief. A.G. is categorically evicted from the State's educational system, even though West Virginia's Constitution combined with the Fourteenth Amendment guarantees a free public-school education. *Pauley v. Kelly*, 162 W. Va. 672, 707 (1979); *see also State v. Beaver*, No. 22-616, 2022 W. Va. LEXIS 700, *36 (W. Va. 2022) ("Both the State Constitution and [West Virginia courts] have established that education is a fundamental right"); *see also Goss v. Lopez*, 419 U.S. 565, 95 (1975) (holding when state law creates a right to public education, that right becomes protected by the Due Process Clause of the Fourteenth Amendment).

176.    Plaintiff will be forced to homeschool A.G. and forego her nursing career, or alternative career(s), and is thus precluded from providing for her family. After Defendants defied Governor Morrisey's Executive Order and rejected the order to honor the religious exemption issued by the Department of Health for A.G. to attend Clear Fork District Elementary School,

Plaintiff is left in indefinite limbo, including making plans to earn needed finances for her family, while not knowing whether A.G. will be able to attend school.

177.    Plaintiff's injuries—past, ongoing, and imminent—cannot be remedied by a later-issued, or significantly delayed, order from this Court.

### PRAYER FOR RELIEF

178.    Pursuant to W.Va. Code §55-13-1 and W.Va. Code § 35-1A-1, it is appropriate and proper that a declaratory judgment be issued by this Court, declaring that the CVL violates the EPRA as applied to Plaintiff.

179.    Pursuant to W.Va. Code §55-13-1 and W.Va. Code § 35-1A-1 and W.Va. Civ. R. Civ. P. 65, it is appropriate and hereby respectfully requested that the Court issue a preliminary injunction on or before **July 25, 2025**, and thereafter at the Court's discretion a permanent injunction, prohibiting Defendants from enforcing the CVL against Plaintiff.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants and provide Plaintiff with the following relief:

A.    Declare the "no religious accommodation" policy to the CVL, as applied by Defendants, violative of W.Va. Code § 35-1A-1;

B.    Issue a preliminary and permanent injunction prohibiting Defendants, their agents, servants, employees and any other persons acting on their behalf from implementing and enforcing W. Va Code § 16-3-4 against Plaintiff without providing a religious exemption or honoring one provided by the State Department of Health, based on application of the EPRA, W.Va. Code § 35-1A-1;

C.    Grant Plaintiff's reasonable attorneys' fees and costs under W.Va. Code § 35-1A-1 and any other applicable authority; and

D.     For any such other and further relief as the Court deems equitable and just under

the circumstances.

Dated: June 24, 2025                          Respectfully submitted,

*/s/ John H. Bryan*
John H. Bryan, Attorney
West Virginia Bar No. 102159
411 Main Street
P.O. Box 366
Union, West Virginia 24983
Tel: (304) 772-4999
jhb@johnbryanlaw.com

SIRI & GLIMSTAD LLP

Aaron Siri, Attorney*
Elizabeth A. Brehm, Attorney*
Buck Dougherty, Attorney*
Catherine Cline, Attorney*
745 Fifth Ave, Suite 500
New York, NY 10151
Tel: (888) 747-4529
Fax: (646) 417-5967
aaron@sirillp.com
ebrehm@sirillp.com
bdougherty@sirillp.com
ccline@sirillp.com

Walker D. Moller, Attorney*
1105 Congress Avenue, Suite 925-C36
Austin, TX 78701
Tel: (888) 747-4529
wmoller@sirillp.com

CHRIS WIEST ATTORNEY AT LAW, PLLC

Christopher Wiest, Attorney*
50 E. Rivercenter Blvd., Ste. 1280
Covington, KY 41011
Tel: (513) 257-1895
chris@cwiestlaw.com

*Attorneys for Plaintiff*
**pro hac vice* to be submitted

40

## VERIFICATION

I, Miranda Guzman, a citizen of the United States and of the state of West Virginia, have read the foregoing Verified Complaint and know the contents thereof as to myself and that the same is true to my own knowledge and as to all other matters on information and belief and I believe them to be true.  Specifically, without limitation and based on my personal knowledge, the factual allegations that pertain to me and my family in paragraphs 1, 3, 10, 11, 13, 14, 15, 20, 21, 25, 84 through 121, 161 through 164, and 175-177 are true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on June 23, 2025, in Clear Creek, West Virginia.


06 / 23 / 2025                                    *Miranda Guzman*
                                                  Miranda Guzman

41